CITIBANK, N.A., Plaintiff–Appellant,

v.

K–H CORPORATION and Kelsey–Hayes Company, Defendants–Appellees.

No. 107, Docket 91–7367.

United States Court of Appeals, Second Circuit.

Argued Oct. 3, 1991.

Decided June 25, 1992.

Peter N. Wang, New York City (Laurie R. Josephs, Friedman, Wang & Bleiberg, P.C., New York City, Latham & Watkins, Chicago, Ill., of counsel), for plaintiff-appellant.

Thomas J. Kavaler, New York City (Howard G. Sloane, Jonathan D. Thier, Katherine B. Harrison, Daniel L. Cantor, Cahill Gordon & Reindel, New York City, Thomas J. Tallerico, Howard & Howard, Bloomfield Hills, Mich., of counsel), for defendants-appellees.

Before: CARDAMONE, PIERCE, and WALKER, Circuit Judges.

PIERCE, Circuit Judge:

Plaintiff-appellant Citibank, N.A. ("Citibank") appeals from a judgment of the United States District Court for the Southern District of New York, Peter K. Leisure, *Judge*, dismissing its fourth amended complaint against K–H Corporation and Kelsey–Hayes Company, seeking to recover damages based on alleged fraud with respect to the financing of the acquisition of four aerospace subsidiaries. The district court dismissed the fourth amended complaint pursuant to Fed.R.Civ.P. 12(b)(6), for failure to state a claim upon which relief could be granted. On appeal, Citibank claims that the complaint adequately states causes of action for violation of the federal securities laws and common law fraud. For the reasons set forth below, we affirm the judgment of the district court.

## BACKGROUND

On May 23, 1989, Citibank, a national banking association located in the State of New York, filed a complaint in the United States District Court for the Southern District of New York, naming as defendants Fruehauf Corporation ("Fruehauf"),[1] a Delaware corporation with its principal place

---

1. Though Fruehauf Corporation has changed its name to K–H Corporation, hereinafter references to the entity will be to Fruehauf.

of business in Michigan, and Kelsey–Hayes Company ("Kelsey–Hayes"), a wholly-owned subsidiary of Fruehauf with its principal place of business in Michigan. Jurisdiction was based on diversity of citizenship of the parties, 28 U.S.C. § 1332. The one-count complaint alleged that Fruehauf and Kelsey–Hayes had made false and fraudulent representations to Citibank to secure an extension of credit. Subsequently a first amended complaint and second amended complaint were filed by Citibank.

On April 10, 1990, Citibank filed a third amended complaint, which contained six counts. This complaint also named appellees as defendants. Counts I, III and V of the third amended complaint asserted violations of the federal securities laws, and Counts II, IV and VI asserted common law fraud claims. On August 22, 1990, the district court granted the defendants' motion to dismiss the third amended complaint, for failure to state a claim, pursuant to Fed.R.Civ.P. 12(b)(6). *Citibank, N.A. v. K–H Corp. and Kelsey–Hayes Co.*, 745 F.Supp. 899 (S.D.N.Y.1990). Citibank was given leave to file a further amended complaint, whereupon it filed a fourth amended complaint on October 4, 1990.

The fourth amended complaint, which was based on deposition testimony and other evidence disclosed during discovery, alleged the following: on June 24, 1987, Grabill Aerospace Industries, Ltd. ("GAIL"), William J. Stoecker—GAIL's sole shareholder—and Citibank, through Citicorp Industrial Credit, Inc., executed a commitment letter whereby Citibank agreed to extend financing to GAIL for the acquisition of five aerospace subsidiaries from Fruehauf and Kelsey–Hayes. Citibank's commitment was conditioned on, *inter alia,* an equity contribution of $20 million into GAIL from Stoecker, Stoecker's pledge to Citibank of the stock of GAIL, and GAIL's pledge of the stock of the aerospace subsidiaries to Citibank.

On June 25, 1987, Fruehauf, Kelsey–Hayes and GAIL entered into a Stock Pur-

chase Agreement in which GAIL agreed to purchase from Fruehauf and Kelsey–Hayes all the shares of stock of the five aerospace subsidiaries for $164 million in cash, plus an amount not to exceed $1 million. As the date of the closing of the purchase of the five aerospace subsidiaries approached, as a result of information available to it, Citibank identified what it considered to be discrepancies with respect to the value of the aerospace subsidiaries. Citibank concluded that the purchase price of $165 million was too high and decided that it would not fund the transaction on that basis. As a result of Citibank's re-evaluation of the aerospace subsidiaries, which it communicated to GAIL, the terms of the transaction were changed: one aerospace subsidiary was eliminated from the purchase and the closing purchase price was reduced to $150 million in cash. These changes were incorporated into an Amendment to the Stock Purchase Agreement. The Amendment to the Stock Purchase Agreement also required that "[a]t the Closing, [GAIL] shall deliver to [Fruehauf] the Closing Purchase Price by wire transfer in immediately available funds...."

To finance the acquisition, GAIL, the four aerospace subsidiaries and Citibank entered into a Secured Credit Agreement. Under the Secured Credit Agreement, the acquisition price was identified as $150 million, which included: (a) a $20 million cash contribution from Stoecker, and (b) financing by Citibank in the form of $50 million from the issuance of mezzanine acquisition notes, a term loan of $75 million and a revolving loan of up to $22.5 million.[2] As collateral security for, and as a condition for Citibank to provide the financing for the acquisition, the Secured Credit Agreement required Stoecker to pledge to Citibank the stock of GAIL and for GAIL to pledge to Citibank the stock of the four aerospace subsidiaries. Also, under the Secured Credit Agreement, another condition to Citibank providing the financing to GAIL was the receipt by GAIL of the $20 million contribution from Stoecker.

---

**2.** We note that the financing detailed in the Secured Credit Agreement totaled $147.5 million although the acquisition price was identified as $150 million, and that the fourth amended complaint alleged that Citibank provided $130 million of the $147.5 million in financing.

Less than a week prior to the closing of the purchase of the four aerospace subsidiaries, Stoecker telephoned Fruehauf's General Counsel and told him that he was unable to provide GAIL with the total cash contribution required under the Secured Credit Agreement. Stoecker requested that Fruehauf allow him to substitute a promissory note for $7 million as part of his required $20 million cash contribution. Fruehauf agreed. During the week when final negotiations took place for the purchase of the four aerospace subsidiaries, a meeting was held between Stoecker and Fruehauf's General Counsel. At this meeting, Stoecker executed a promissory note in favor of Fruehauf in the amount of $7 million. The promissory note was not mentioned in the closing papers for the acquisition of the four aerospace subsidiaries, or in any other documents relating to the financing or closing of the acquisition, and prior to the closing Fruehauf and Kelsey–Hayes did not disclose the transaction reflected by the promissory note or the existence thereof to Citibank.

During the closing, Fruehauf made a wire transfer of $7 million of its own funds from an account in Detroit, Michigan to the account in California to which the funds representing the closing purchase price were to be transferred by GAIL and Stoecker. Fruehauf and Kelsey–Hayes, though aware of the wire transfer, did not disclose it to Citibank.

On August 6, 1987, at the closing, representatives or agents of Fruehauf and Kelsey–Hayes represented that the full closing purchase price of $150 million in cash had been received by Fruehauf's bank from GAIL. The representatives of the defendants contemporaneously delivered to Citibank opinion letters executed by Fruehauf's General Counsel to the same effect. Representatives of Fruehauf and Kelsey–Hayes permitted the acquisition to close and accepted, as part of the purchase price, $130 million in financing from Citibank.

The fourth amended complaint alleged that the defendants and Stoecker fraudulently induced Citibank to believe that the aerospace subsidiaries were worth $150 million cash in an arms-length transaction. The $150 million cash market valuation was allegedly misleading in two respects: (1) instead of a cash price, the actual consideration paid to Fruehauf was paid partly in cash and partly by an unsecured promissory note from Stoecker, the sole shareholder of the buyer GAIL; and (2) the price was not negotiated at arms-length, but GAIL was forced to accept Fruehauf's asking price because GAIL's sole shareholder was dependent on Fruehauf to provide a major portion of the equity capital required for the deal and thus was unable to bargain fully with Fruehauf.

According to the fourth amended complaint, because "GAIL was a holding company formed for the purposes of the Acquisition, with no material assets other than the stock of the subsidiaries [the] defendants knew that Citibank relied solely upon stock that Citibank believed was worth $150 million in cash as collateral for the extension of $147.5 million in credit for financing the Acquisition...." If Citibank had been aware of the other financing agreement between Fruehauf and Stoecker, the complaint alleged, Citibank would have refused to provide the financing as contemplated. Later, after GAIL defaulted and Citibank was unable to realize $150 million from the sale of its collateral—the GAIL stock and the stock of the four aerospace subsidiaries—in satisfaction of the loan, it filed this suit.

The fourth amended complaint contains six counts. Count I asserts that Fruehauf's and Kelsey–Hayes' alleged fraudulent conduct, misrepresentations and concealments violated § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1988), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5 (1991). Count III alleges that Fruehauf and Kelsey–Hayes aided and abetted Stoecker's violation of § 10(b) and Rule 10b–5; and Count V alleges that Fruehauf conspired with Stoecker to violate § 10(b) and Rule 10b–5. The remaining three counts allege violations of state law. Count II asserts that Fruehauf's and Kelsey–Hayes' conduct rendered them liable to Citibank for common law fraud; Count IV alleges that

Fruehauf and Kelsey–Hayes aided and abetted Stoecker's common law fraud; and Count VI alleges that Fruehauf conspired with Stoecker to defraud Citibank.

On November 9, 1990, Fruehauf and Kelsey–Hayes moved to dismiss the fourth amended complaint for failure to state a claim upon which relief could be granted. In a memorandum of law in support of the motion, Fruehauf and Kelsey–Hayes asserted that Stoecker had repaid the $7 million promissory note within three weeks of its execution in 1987 and that Citibank suffered its loss more than two years later, after GAIL had defaulted on the loan. In a memorandum filed on November 30, 1990 in response to the defendants' motion to dismiss, Citibank characterized the defendants' observation that the promissory note was paid within several weeks of its execution as "entirely irrelevant."

In an Order and Opinion dated March 14, 1991, the court granted the motion to dismiss. Relying on *Chemical Bank v. Arthur Andersen & Co.*, 726 F.2d 930, 943 (2d Cir.), *cert. denied*, 469 U.S. 884, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984), the district court found that Citibank had failed, in the fourth amended complaint, to satisfy the "in connection with" requirement of § 10(b). The court determined also that the loss causation requirement of § 10(b), that is, how the alleged misrepresentations or omissions caused the economic harm, had not been sufficiently pleaded. It found that Citibank's losses were a result of an imprudent decision to lend GAIL $147.5 million and not the direct and proximate result of the non-disclosure of the relatively small promissory note. The court went

on to state, "common sense indicates that any loss suffered by Citibank due to the non-disclosure of a promissory note in the amount of less than five percent of the purchase price, fully repaid in three weeks, would be dwarfed by losses caused by other factors...."

The district court also concluded that Citibank had failed to state a claim for which relief could be granted with respect to the common law fraud counts. It stated that the fourth amended complaint failed to allege proximate causation "between the non-disclosure of the three-week, $7 million loan [between Fruehauf and Stoecker,] and the decline in the value of the securities pledged by Stoecker and GAIL as collateral [to Citibank]." Judgment dismissing the complaint for failure to state a claim upon which relief could be granted, pursuant to Fed.R.Civ.P. 12(b)(6), was entered March 25, 1991. This appeal followed.

## DISCUSSION

Appellant Citibank contends that the district court narrowly interpreted and erroneously applied the federal securities laws and the elements of common law fraud in dismissing the fourth amended complaint. The principal legal issues before us are: apropos the federal securities laws counts, (a) whether the fourth amended complaint adequately pleaded that the alleged fraud was "in connection with" the sale or purchase of securities as required under § 10(b) of the Securities Exchange Act of 1934,[3] and Rule 10b–5;[4] and (b) whether the fourth amended complaint adequately alleged loss causation. Apropos the com-

---

**3.** Section 10(b) makes it unlawful for any person

[t]o use or employ, in connection with the purchase or sale of any security ..., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b) (1988).

**4.** Rule 10b–5, provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of

the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5 (1991).

mon law fraud counts, the issue presented is whether the complaint sufficiently pleaded proximate causation.

### A. *Standard of Review*

■ The standard of review of the grant of a motion under Rule 12(b)(6), which is a ruling of law, is *de novo. Austern v. Chicago Bd. Options Exch., Inc.,* 898 F.2d 882, 885 (2d Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 141, 112 L.Ed.2d 107 (1990). A dismissal under Rule 12(b)(6) will be affirmed only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. *Id.*

Citibank argues, *inter alia,* that the district court relied on materials outside the complaint in dismissing the fourth amended complaint. More specifically, Citibank claims that the court's assertion that Stoecker paid the loan within three weeks of its execution is a matter outside the complaint. We do not read the district court's discussion of either the loss causation requirement of § 10b–5 or its discussion of the causation requirement under New York law as necessarily relying on materials outside the complaint. Since the court's judgment can be supported without reliance on the asserted repayment of the loan, we affirm the district court judgment because, as alleged in the fourth amended complaint, Citibank did not sufficiently plead facts that could entitle it to relief.

### B. *Fourth Amended Complaint*

The fourth amended complaint described a loan transaction between Citibank and GAIL, whereby Citibank agreed to extend credit to GAIL for it to acquire four aerospace subsidiaries from Fruehauf and Kelsey–Hayes. According to the fourth amended complaint, Stoecker, the sole shareholder of GAIL, entered into a subsequent loan agreement with the seller Fruehauf. Pursuant to this loan agreement, Stoecker executed a promissory note in favor of Fruehauf for $7 million. Thereafter, Fruehauf made a wire transfer of $7 million to the account to which the funds representing the closing purchase price were to be transferred by GAIL and Stoecker.

Citibank contends that because of the Stoecker–Fruehauf agreement, the terms of Citibank's credit agreement with GAIL were not complied with, although Stoecker, Fruehauf and Kelsey–Hayes acted and represented to the contrary. Since the stock of GAIL and the stock of the aerospace subsidiaries were pledged as collateral to Citibank in the Secured Credit Agreement, Citibank argues, Fruehauf's and Stoecker's conduct constituted fraud "in connection with" the pledge of the stock of GAIL and the stock of the aerospace subsidiaries in violation of § 10(b) and Rule 10b–5.

■ In order to state a *prima facie* case of a violation of § 10(b), when face-to-face affirmative misrepresentations have been made, a plaintiff must allege:

(1) damage to plaintiff, (2) caused by reliance on defendant's misrepresentations or omissions of material facts, or on a scheme by defendant to defraud, (3) made with scienter (i.e., an intent to deceive, manipulate or defraud, or possibly with reckless disregard), (4) in connection with the purchase or sale of securities, and (5) furthered by defendant's use of the mails or any facility of a national securities exchange.

*Royal Am. Managers, Inc. v. IRC Holding Corp.,* 885 F.2d 1011, 1015 (2d Cir.1989). We note also that the plaintiff, in stating a *prima facie* case, must allege two types of causation, "both loss causation—that the misrepresentations or omission caused the economic harm—and transaction causation—that the violations in question caused the plaintiff to engage in the transaction in question." *Bennett v. United States Trust Co. of New York,* 770 F.2d 308, 313 (2d Cir.1985) (emphasis, quotation and internal brackets omitted), *cert. denied,* 474 U.S. 1058, 106 S.Ct. 800, 88 L.Ed.2d 776 (1986); *see Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.,* 967 F.2d 742, 747 (2d Cir.1992).

### 1. Federal Securities Laws Claims

The district court determined that the fourth amended complaint failed to ade-

quately plead the "in connection with" requirement of § 10(b), and that the complaint did not adequately plead loss causation.

### a) *"In Connection With" Requirement*

On appeal, Citibank claims that the district court too narrowly interpreted the "in connection with" requirement. Citibank contends that the misrepresentations alleged in the complaint were sufficiently connected with the value of the pledged stock because the alleged misrepresentations directly involved the net economic effect of the actual consideration paid for the aerospace subsidiaries.

Assuming *arguendo*, that these allegations were adequate to satisfy the "in connection with" requirement, the fourth amended complaint still did not state a claim under the federal securities laws because it did not adequately plead loss causation. *See Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57, 61 (2d Cir.1985).

### b) *Loss Causation*

Appellant asserts that the district court improperly required that it allege in the complaint loss causation as something wholly different and apart from transaction causation. Citibank argues that loss causation is easily demonstrated by proof of some economic damage and that, in any event, the requirement has been substantially eliminated in this Court, in cases in which the misrepresentations actually are alleged to have induced the transaction. It asserts that this is such a case.

■ We disagree. We believe that the fourth amended complaint fails to allege loss causation. To establish loss causation a plaintiff must show, that the economic harm that it suffered *occurred as a result of* the alleged misrepresentations. *See Bloor*, 754 F.2d at 61. We have on occasion likened loss causation to the tort concept of proximate cause, *see Litton*, 967 F.2d at 747 ("The causation analysis [in a § 10(b) claim] encompasses two related, yet distinct elements—reliance and causation—elements that, in effect, correspond respec-

tively with common law notions of 'but for' and proximate causation."), because, similar to proximate cause, in order to establish loss causation, a plaintiff must prove that the damage suffered was a foreseeable consequence of the misrepresentation. *Manufacturers Hanover Trust Co. v. Drysdale Sec. Corp.*, 801 F.2d 13, 20–21 (2d Cir.1986).

Contrary to Citibank's assertion otherwise, this Court also requires the plaintiff to allege that the misrepresentation induced it to enter into the transaction and that the misrepresentation was the cause of the actual loss suffered. *Id.* at 20 (citing *Chemical Bank*, 726 F.2d at 943 & n. 23; *Marbury Management, Inc. v. Kohn*, 629 F.2d 705 (2d Cir.), *cert. denied*, 449 U.S. 1011, 101 S.Ct. 566, 66 L.Ed.2d 469 (1980); *Schlick v. Penn–Dixie Cement Corp.*, 507 F.2d 374, 380 (2d Cir.1974), *cert. denied*, 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975)).

■ In the fourth amended complaint Citibank alleged that Stoecker's and Fruehauf's fraud induced it to extend credit to GAIL. However, we agree with the district court that the fourth amended complaint's assertion that "[i]f Citibank had been aware of the agreements between Fruehauf and Stoecker, it would have reacted appropriately, in this case by refusing to provide the financing as contemplated," alleged only "but-for" causation. Citibank does not allege facts that support its allegation that there is a causal connection between the fraud alleged and the subsequent loss that it suffered. In short, in the complaint Citibank "suggest[s] no reason why the investment was wiped out. [Citibank has] alleged the cause of [its] entering into the transaction in which [it] lost money but not the cause of the transaction's turning out to be a losing one." *Bastian v. Petren Resources Corp.*, 892 F.2d 680, 684 (7th Cir.) (emphasis omitted), *cert. denied*, 496 U.S. 906, 110 S.Ct. 2590, 110 L.Ed.2d 270 (1990); *see also Securities Investors Protection Corp. v. Vigman*, 908 F.2d 1461, 1467 (9th Cir.1990) (" '[L]oss causation' is simply a label used to describe the standard rule of tort law that a plain-

tiff must allege and prove a sufficient causal connection between the defendant's wrongdoing and the plaintiff's harm."), *rev'd on other grounds*, — U.S. —, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992); Restatement (Second) Torts § 548A cmt. b at 107 (1977) ("[T]here is no liability [for legal causation of pecuniary loss] when the value of the stock goes down after the sale, not in any way because of the misrepresented financial condition, but as a result of some subsequent event that has no connection with or relation to its financial condition."). Accordingly, because the fourth amended complaint did not properly allege proximate causation between the alleged fraud and the loss Citibank subsequently suffered, it failed to satisfy the loss causation requirement under § 10(b) and Rule 10b–5. Therefore, the judgment dismissing Count I of the complaint was proper. *Bloor*, 754 F.2d at 62. Counts III and V of the fourth amended complaint, which alleged aiding, abetting and conspiracy liability premised on a violation of § 10(b) and Rule 10b–5, were also properly dismissed because primary liability under the federal securities laws was not established. *Id.* at 63.

### 2. Common Law Fraud

The fourth amended complaint alleged that Fruehauf's and Kelsey–Hayes' conduct rendered them liable to Citibank for common law fraud, that Fruehauf and Kelsey–Hayes aided and abetted Stoecker's common law fraud, and that Fruehauf conspired with Stoecker to defraud Citibank. The parties do not dispute that New York law governs the common law fraud claims.

Under New York law,

[f]raud is generally defined by reciting the five elements essential to sustain that cause of action. There must be a representation of fact, which is either untrue and known to be untrue or recklessly made, and which is offered to deceive the other party and to induce them to act upon it, causing injury.

*Jo Ann Homes at Bellmore, Inc. v. Dworetz*, 25 N.Y.2d 112, 119, 250 N.E.2d 214, 217, 302 N.Y.S.2d 799, 803 (1969).

The district court dismissed the common law fraud claims in the fourth amended complaint because it found that the complaint did not sufficiently plead proximate causation between the alleged misrepresentation and the loss Citibank suffered. Citibank argues that under New York law, proximate causation is satisfactorily pleaded in a suit for common law fraud by a lender, when the lender alleges that (a) it would not have financed a transaction but-for the alleged misrepresentation, and (b) the financing was not repaid.

■ We do not read New York law on proximate cause, as it relates to fraud, so broadly. *See Brackett v. Griswold*, 112 N.Y. 454, 469, 20 N.E. 376, 380 (1889) (to recover in action for fraud and deceit, the fraud and injury must be connected; it must appear in an appreciable sense that damage flowed from fraud as proximate and not remote cause). Under New York law, an "injury is proximately caused if it is the natural and probable consequence of the defrauder's misrepresentation or if the defrauder ought reasonably to have foreseen that the injury was a probable consequence of his fraud." *Cumberland Oil Corp. v. Thropp*, 791 F.2d 1037, 1044 (2d Cir.), *cert. denied*, 479 U.S. 950, 107 S.Ct. 436, 93 L.Ed.2d 385 (1986); *see also* 60 N.Y.Jur.2d, *Fraud and Deceit* § 169 (1987) (it must appear that damages flowing from fraud were proximate and not remote cause; damages must be natural and probable consequence of defrauder's acts).

■ Citibank argues that in the fourth amended complaint, it alleged "an astonishingly basic fraud upon a lender, induced to finance an acquisition which it would *not* otherwise have financed as a result of the buyer's and sellers' concerted and secret deception." (emphasis in original). We agree with the district court, however, that Citibank did not adequately allege that the damages it suffered were proximately caused by the alleged misrepresentations of Fruehauf and Kelsey–Hayes, and that the fourth amended complaint failed to allege adequately a causal connection between the non-disclosure of the promissory

note and the subsequent decline in the value of the securities pledged by Stoecker and GAIL as collateral to Citibank. Although the fourth amended complaint, in a conclusory fashion, avers that "there is a direct causal link between defendants' fraud and Citibank's losses," the complaint does not detail how the alleged fraud directly and proximately resulted in Citibank's inability to realize $150 million from its collateral, in satisfaction of the loan with GAIL, by selling the stock.

Therefore, Count II of the fourth amended complaint was properly dismissed. Similarly, Counts IV and VI in the fourth amended complaint, which alleged aiding and abetting and conspiracy liability based on common law fraud, were also properly dismissed because primary liability for common law fraud was not sufficiently pleaded. *See Brackett*, 112 N.Y. at 466–67, 20 N.E. at 379 ("a mere conspiracy to commit a fraud is never of itself a cause of action").

## CONCLUSION

For the foregoing reasons, the judgment of the district court is affirmed.