**EMERGENT CAPITAL INVESTMENT MANAGEMENT, LLC, Plaintiff,**

v.

**STONEPATH GROUP, INC. (previously known as Net Value Holdings, Inc.), Andrew Panzo, and Less Hansen, Defendants.**

**No. 00 CIV. 7723(RWS).**

United States District Court,
S.D. New York.

April 16, 2002.

---

Heller, Horowitz & Feit, New York, NY, Martin Stein, Esq., Of Counsel, for Plaintiff.

Kasowitz, Benson, Torres & Friedman, New York, NY, James J. Stricker, Esq., Of Counsel, Klehr, Harrison, Harvey, Branzburg & Ellers, Philadelphia, PA, Richard M. Beck, Esq., Of Counsel, for Defendants.

## OPINION

SWEET, District Judge.

Defendants Stonepath Group, Inc. ("Stonepath"), previously known as Net Value Holdings, Inc. ("NETV"); Andrew Panzo ("Panzo"); and Lee Hansen ("Hansen") have moved pursuant to Fed.R.Civ.P. 12(b)(6) to dismiss the second amended complaint of plaintiff Emergent Capital Investment Management LLC ("Emergent").

For the following reasons, that motion is granted.

### Facts

The facts underlying this dispute were described in greater detail in *Emergent Capital Investment Management v. Stonepath Group, Inc.*, 165 F.Supp.2d 615 (S.D.N.Y.2001), familiarity with which is presumed. The facts below are taken

from Emergent's second amended complaint.

The second amended complaint that is the subject of defendants' motion to dismiss is the fourth complaint in this lawsuit to recover Emergent's investment in Stonepath through a March 2000 private placement transaction. The third complaint was dismissed by this Court on October 3, 2001, under Federal Rules 56 and 12(b)(6). Emergent was given a limited right to replead the motion dismissed under Rule 12(b)(6).

At issue are the events and representations leading up to a March 3, 2000 transaction in which Emergent purchased $2 million in NETV stock, at approximately $12 per share. Following this purchase, the price of NETV shares fell below $1. Emergent claims that several misrepresentations or omissions induced it to make this investment. First, it claims that Stonepath stated that it had invested $14 million in an e-commerce company when it had only invested $4 million. Second, Emergent claims that Stonepath never revealed the close connections between NETV and a man who has been barred from the securities industry for life.

### A. *Investments in Brightstreet*

Emergent and Stonepath initially met at a meeting in Emergent's New York offices on January 20, 2000. Hansen, who is alleged to have been a "close friend" of one of Emergent principals, Mark Waldron ("Waldron"), solicited and arranged for the meeting. Stonepath representatives stated at the meeting that they sought approximately $20 million in capital in a private placement that would be memorialized in a written agreement or series of agreements.

At the meeting, Panzo and Hansen orally represented to the two principals of Emergent, Waldron and Daniel Yun ("Yun"), that NETV had invested approxi-

mately $17 million in seven e-commerce companies. They represented that of the seven, the largest investment was $14 million, which NETV had paid for a 12% equity interest in Brightstreet.com, Inc. ("Brightstreet"). At the meeting, Panzo and Hansen gave Waldron and Yun a document entitled, *Net Value Holdings, Smart Seed Capital* (the "Brochure"), which listed seven companies in which NETV had made investments. The Brochure stated that NETV invested $14 million in Brightstreet for a 12% ownership interest. Emergent alleges that the brochure was intended to take the place of a private placement memorandum.

At a meeting in July 2000, defendants again represented in writing and orally to Emergent that the amount of NETV's investment in Brightstreet was $14 million. Panzo and Hansen gave Yun and Waldron a document entitled *Net Value Holdings, Building and Accelerating Technology Businesses*, confirming this representation.

In April 2001, Panzo stated under oath that the investment in Brightstreet was $14 million.

In fact, according to its 1999 Form 10–K, NETV had invested only $4 million or less in Brightstreet, not $14 million as the defendants represented. The form, signed by Panzo and Hansen, was filed with the SEC on May 11, 2000. NETV's 2000 Form 10–K also affirmed that the amount was $4 million. That form, filed on April 2, 2001, was signed by Panzo and Hansen.

A $14 million investment in Brightstreet would have been NETV's largest asset. Emergent alleges that the investment "related directly to the value of NETV and therefore to the value and the price of the shares" they purchased. Emergent claims that Waldron and Yun relied on this misrepresentation, and that Waldron and Yun specifically discussed the Brightstreet in-

vestment in determining whether to invest in NETV.

## B. *Non–Disclosure of Panzo's Prior History and Relationship with Appell*

Emergent claims that it relied on Panzo's "experience, judgment, management, business skills, character and honesty" in assessing the merits of its investment in Stonepath. At the time of purchase, Emergent was not aware of NETV's and Panzo's purported relationship with Howard M. Appel, who was barred for life by the National Association of Security Dealers ("NASD") from the securities industry in or about August 1991 as a result of his sale of unregistered shares of common stock to customers.

### 1. *Panzo's Relationship with Appel*

In 1992 and 1993, Panzo was employed as an executive vice president by HMA Investments ("HMA"), a company in which Appel was the principal. Panzo testified in an April 25, 2001 deposition that he left HMA after learning of Appel's "sordid past."

Since leaving HMA in 1993, Panzo has collaborated with Appel as a promotor, investor in, and/or founder of various companies, most of which culminated in a merger between a public shell corporation and a private operating corporation. Emergent alleges that Appel would usually arrange for Panzo to become a director of the public company, because Appel could not become a director without disclosing his troubles with the NASD. Both Appel and Panzo would own substantial amounts of shares in the public companies and subsequently sell them for large profits. Emergent alleges that in every collaboration, the shares of the subject companies subsequently became virtually worthless, and in at least two instances the companies in question filed for protection under the Bankruptcy Code.

### a. *Sector Associates and Viragen*

Emergent alleges that Appel achieved control over Sector Associates Ltd. ("Sector") and installed Panzo as president and as one of two directors of the company by November 1993.

In September 1995, Sector had no operations of its own and was a public shell. On or about September 20, 1995, Sector entered into a reverse merger agreement with Viragen Scotland Ltd. ("VSL"), a private company, and its largest shareholder, Viragen, Inc. ("Viragen"), whereby Sector would acquire 100% of the stock in VSL in exchange for its distribution to Viragen of newly issued convertible preferred shares of Sector representing approximately 94% of the outstanding capital stock of Sector after the acquisition.

On or about November 3, 1995, FAC Enterprises, Inc. ("FAC"), Appel's wholly owned company, purchased 1,569,510 shares of Sector's common stock from the company, and more than five million warrants exercisable at $0.43 per share for a total purchase price of $350,000. He did this with the consent and approval of Panzo as Sector's president and director. FAC then owned 48.3% of Sector's common shares.

Emergent alleges that Appel also arranged for Panzo through his company American Maple Leaf Corporation ("AML") to receive 35,000 shares of Sector for little or no consideration.

The reverse merger closed in December 1995. Subsequent to the closing, FAC received additional free common shares representing 3% of the common shares of Sector after the acquisition, as a finder's fee, pursuant to an agreement dated November 7, 1995.

In May 1996, Sector changed its name to Viragen Europe and its common stock was reverse split one for fourteen (1:14). Ap-

pel, through FAC, owned more than 300,-000 shares of Viragen Europe, 200,000 of which were received as a finder's fee.

FAC sold its shares of Viragen Europe in 1996 and 1997 at a profit of several million dollars. Panzo also sold his shares at a substantial profit.

As of April 27, 2001, the shares of Viragen Europe were trading at $0.64 per share.

### b. Eastwind Group

On January 25, 1995, Appel and Panzo caused Sector to make an equity investment of $500,000 in Eastwind Group Inc. ("Eastwind") in exchange for 200,000 common shares plus certain warrants. Eastwind had no operations at that time.

As a result of the investment, Emergent alleges that Panzo was placed on the board of directors of Eastwind. In addition, Eastwind entered into a voting trust agreement with Panzo's company, AML, and Appel's company, FAC. By the agreement, AML and FAC jointly were entitled to elect one member of Eastwind's board of directors. Finally, Eastwind entered into an Investment Bank Advisor Agreement with AML and FAC, pursuant to which FAC received 40,000 Eastwind common shares and Panzo received 10,000 shares for unspecified consulting services. FAC and AML subsequently received an additional 100,000 shares of Eastwind common stock plus warrants to purchase an additional 100,000 shares pursuant to that agreement. Those warrants were subsequently exercised. AML and FAC thus received 250,000 common shares of Eastwind, while Sector, which invested the initial $500,000, received only 200,000 shares.

Emergent alleges that Panzo and Appel, through AML and FAC, sold all or substantially all of their Eastwind shares at a substantial profit.

In 2000, Eastwind filed for bankruptcy pursuant to Chapter 11 of the Bankruptcy Code. Its stock is worthless.

### c. Commodore Holdings

In 1995, Appel's companies FAC and I.P. Services Inc. ("IP") acquired 120,000 and 50,000 shares of Commodore Holdings Ltd. ("Commodore"), a Bermuda corporation formed for the purpose of purchasing cruise ships. They paid approximately $1 per share.

Sometime prior to July 1996, AML acquired 125,000 shares of Commodore at Appel's suggestion. AML paid approximately $1 per share.

In 1996, Panzo and Appel sold the shares owned by their respective companies at substantial profits, at prices of up to $6 per share.

Commodore shares were valued at $0.01 per share at the time Emergent filed its amended complaint.

### d. VDC

Prior to July 18, 1996, Appel gained control of VDC Inc. and its parent company VDC Corporation Ltd. and installed Panzo as president of VDC Inc. and director of VDC Corporation.

On or about December 17, 1997, VDC Inc., VDC Corporation and Sky King Communications Inc. ("Sky King") signed an agreement whereby VDC Inc. would acquire the stock of Sky King in a reverse acquisition transaction. On or about March 6, 1998, the parties signed an amendment to the merger agreement that provided, *inter alia,* that upon closing, Appel's company FAC would receive 185,000 shares as an investment banking fee. Panzo signed the merger agreement and the amendment as president of VDC Inc.

In December 1998, the company issued 129,852 shares to FAC in partial satisfac-

tion of its obligation under the amendment. The transaction had closed by then and the stocks were publicly traded under the name VDC Communications. VDC subsequently issued additional shares to FAC in satisfaction of its obligation.

Between April 1, 2000 and May 31, 2000, FAC sold at least 100,000 shares of VDC Communications, at prices between $2 and $4 per share, with the entire proceeds being profits.

The price of VDC communications was $0.02 per share at the time Emergent filed its amended complaint.

### e. *Osage Systems*

By November 1997, Appel was a controlling person of Pacific Rim Entertainment Inc. ("Pacific Rim").

On November 11, 1997, Pacific Rim entered into an agreement with Osage Computer Group, Inc. ("Osage"), a private company, for a reverse merger, whereby Pacific Rim acquired the stock of Osage in exchange for shares of Pacific Rim. The merger closed on December 22, 1997, and Pacific Rim changed its name to Osage.

In anticipation of the merger, Appel caused Pacific Rim to sell 175,000 shares of common stock to one of his companies, Millworth Investments, Inc. ("Millworth"), at $0.10 per share. He also caused Pacific Rim to sell to two of his other companies, FAC and IP, 120,000 and 130,000 shares respectively at founders' prices.

Appel also caused Osage to appoint Panzo as director of Osage beginning in December 1997; to issue Panzo (through AML) warrants to purchase 21,000 common shares; and to enter into an investment banking agreement with AML pursuant to which AML received warrants to purchase an additional 50,000 shares and earned $30,000 per month.

Appel's companies sold at least 250,000 Osage shares to the public during 1999 and made significant profits on the transactions.

Osage filed for protection pursuant to the Bankruptcy Code on or about February 15, 2001.

### f. *Aviation Holdings Group*

In October 1996, Appel's company IP purchased 80,000 shares of Aviation Holdings International ("Aviation International") for $24,510. Appel's company FAC received 100,000 shares as repayment for a $200,000 loan in August 1997 and 7,500 shares for advisory services. IP and FAC loaned the company more than $1 million between them.

Aviation Holdings Group ("Aviation Group") was incorporated in January 1998 as a Delaware corporation under the name EyeQ Networking Inc. ("EyeQ Delaware"), a wholly owned subsidiary of EyeQ Networking Inc., a Colorado corporation ("EyeQ Colorado"). On at least one document, EyeQ Delaware listed the same address as HMA Associates, another Appel company. EyeQ Delaware merged into EyeQ Colorado in 1998 and subsequently changed its name to Aviation Group.

Aviation Group acquired 96% of the stock of Aviation International between 1998 and 1999. Until that time, Aviation Group was a public shell. Appel is described as an "organizer" of Aviation International in the public filings of Aviation Group. Emergent alleges that Appel conceived of and structured the transaction between Aviation Group and Aviation International.

Appel induced Panzo to become president of EyeQ Colorado. After Aviation Group acquired Aviation International, Panzo through his corporation APP Investments became the largest shareholder in Aviation Group, with an ownership in-

terest of 745,000 shares—more than 17% of shares.

The stock of Aviation Group was trading at more than $5.00 per share in 1999. It was trading at $0.01 at the time Emergent filed its amended complaint.

### g. *NAL Financial Group, Inc.*

In November 1994, Panzo was the president and a director of NAL Financial Group, Inc. ("NAL"), an operating private company.

On November 30, 1994, NAL consummated a reverse merger with Corporate Financial Ventures, Inc. ("COFVI"), an inactive public company, whereby the shareholders of NAL exchanged all of their shares of NAL stock in exchange for approximately 56% of the shares of COFVI. COFVI then changed its name to NAL.

In October 1994, in contemplation of the merger, Panzo arranged for COFVI to sell him 333,333 common shares for a price of $19,000, which was far below their anticipated value after the merger. Panzo also received warrants, through AML, to purchase 33,000 shares for unspecified advisory services.

Panzo resigned from the board of COFVI at the time the merger was consummated on November 30, 1994. He was reappointed to the board of NAL in August 1995 and remained on the board through March 1996. In exchange for unspecified advisory services, Appel's company FAC received warrants to purchase 75,000 shares of NAL in August and September 1995 and warrants to purchase 34,000 shares of NAL in May 1995.

Appel, through FAC and HMA, also purchased convertible debenture units of NAL for approximately $1.35 million.

Panzo and Appel sold all or substantially all of their NAL shares for a substantial profit at a price of at least $8 per share. The stock of NAL is currently worthless.

It was trading at less than $0.01 per share at the time Emergent filed its amended complaint.

NETV filed no public documents that disclosed Panzo's prior affiliation with Appel or any companies owned or controlled by Appel.

### 2. *Appel's Relationship with NETV*

Emergent claims that Appel is the founder and a controlling shareholder of NETV.

NETV was originally a Florida corporation known as SUNCL. Prior to August 1998, SUNCL was a public shell and had no operations of its own. In or about August 1998, SUNCL signed a letter of intent to merge with Net Value, Inc. In contemplation of the merger, SUNCL changed its name to Net Value Holdings, Inc., or NETV, and reincorporated in Delaware.

Between October and December 1998, NETV acquired most of the common stock and all of the preferred stock of Net Value Inc. The merger was completed in November 2000. As part of the merger, the shareholders of Net Value Inc. received shares of NETV.

Emergent claims that a number of shareholders of Net Value Inc. stock had ties with Appel. These shareholders are Millworth, Steven Rosner, SPH Investments, Inc., and SPH Equities. According to a Form 10–K filed with the SEC on April 12, 2000, Appel is the President of Millworth. Rosner worked for HMA in the early 1990's and was also a substantial shareholder in a number of Appel's companies. SPH Investments and SPH Equities are owned by Stephen P. Harrington, an affiliate of Appel. SPH owned a substantial number of shares in a number of Appel's corporations.

In addition, Rozel International Holdings ("Rozel") has at all relevant times been the largest shareholder of NETV, owning three million shares at one time. Emergent alleges that Appel and Panzo control Rozel, although nominal control vests with an individual named Harold Chaffee.[1] During the past fifteen months, Rozel has sold more than one million shares of NETV, and it has filed Forms 133 for the proposed sale of an additional 300,000 shares.

### C. *The Amended Complaint*

Emergent filed the second amended complaint on October 19, 2001, alleging three claims for relief. First, it alleged that the statements regarding Brightstreet and the omission of details concerning NETV's association with Appel violated section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder. Second, Emergent alleged that Hansen and Panzo are "controlling persons" of NETV under Section 20 of the Exchange Act, 15 U.S.C. § 78t, and are personally liable to Emergent for NETV's violations of Section 10(b) and Rule 10b–5. Finally, Emergent claimed common law fraud.

Stonepath filed its motion to dismiss the instant amended complaint on November 20, 2001. Emergent filed a response on January 2, 2002, and Stonepath responded on January 23, 2002. The motion was argued and considered fully submitted on February 13, 2002.

### DISCUSSION

#### I. *Rule 12(b)(6) Standard of Review*

In reviewing a motion to dismiss under Rule 12(b)(6), courts must "accept as true the factual allegations of the complaint, and draw all inferences in favor of the pleader." *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1174 (2d Cir.1993) (*citing IUE AFL–CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1052 (2d Cir.1993)). Review must be limited to the complaint and documents attached or incorporated by reference thereto. *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773 (2d Cir. 1991). In this context, the Second Circuit has held that a complaint is deemed to "include ... documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit." *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir.2000). However, "legal conclusions, deductions, or opinions couched as factual allegations are not given a presumption of truthfulness." *L'Europeenne de Banque v. La Republica de Venezuela*, 700 F.Supp. 114, 122 (S.D.N.Y.1988). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir.1995) (*quoting Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)). A complaint may only be dismissed when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitled him to relief." *Con-*

---

1. Rozel was a substantial shareholder in all eight of the companies discussed in the preceding section as collaborations between Appel and Panzo. Rozel owned 362,318 (more than 5%) of NAL shares; 431,000 shares of VDC; 155,000 shares of Commodore; and substantial amounts of stock in the other five companies in which Appel and Panzo owned shares. Rozel is also listed as a substantial shareholder, creditor and/or borrower along with one or more of Appel's corporations (HMA, IP, FAC, or Millworth) in the public filings of four corporations: Cytomedix, Silver King Resources, Skynet Holdings, and Portacom Wireless. Emergent alleges that the common investments are not a coincidence but were made in concert with or at the direction of Appel. Panzo testified at deposition that Appel introduced Panzo to Rozel.

*ley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). *See also Allen v. WestPoint–Pepperell, Inc.,* 945 F.2d 40, 44 (2d Cir.1991); *Bernheim v. Litt,* 79 F.3d 318, 321 (2d Cir.1996).

## II. Whether Deficiencies in Previous Complaint Have Been Corrected

This Court previously held that Emergent's complaint must be dismissed because it failed to allege loss causation or reasonable reliance. Each will be addressed in turn.

### A. Loss Causation

Emergent's first and second claims allege violations of Rule 10b–5. To sustain such allegations, a plaintiff must show that " 'in connection with the purchase or sale of securities, the defendant, acting with scienter, made a false material misrepresentation or omitted to disclose material information and that plaintiff's reliance on defendant's action caused [plaintiff] injury.' " *Press v. Chem. Inv. Servs. Corp.,* 166 F.3d 529, 534 (2d Cir.1999) (*quoting Time Warner Inc. Secs. Litig.,* 9 F.3d 259, 264 (2d Cir.1993)).

Causation under federal securities laws requires both (1) transaction causation (but for the fraudulent statement or omission the plaintiff would not have entered into the transaction); and (2) loss causation (the subject of the fraudulent statement or omission was the cause of the actual loss suffered). *Suez Equity Investors v. Toronto–Dominion Bank,* 250 F.3d 87, 95 (2d Cir.2001) (*citing Mfrs. Hanover Trust Co. v. Drysdale Secs. Corp.,* 801 F.2d 13, 20 (2d Cir.1986) ("The standard for liability in a civil action under section 10(b) is causation not merely in inducing the plaintiff to enter into a transaction or series of transactions, but causation of the actual loss suffered.")). The Litigation Reform Act similarly requires the plaintiff to demonstrate that the act complained of "caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u–4(b)(4).

At issue here is loss causation, which is similar to the tort concept of proximate cause. Thus, "in order for the plaintiff to recover it must prove the damages it suffered were a foreseeable consequence of the misrepresentation." *Suez Equity,* 250 F.3d at 96 (*citing Citibank N.A. v. K–H Corp.,* 968 F.2d 1489, 1495 (2d Cir.1992)). The loss causation inquiry typically examines how directly the subject of the fraudulent statement caused the loss, whether the resulting loss was a foreseeable outcome of the fraudulent statement and other factors such as intervening causes and the lapse of time between the fraudulent statement and the loss. *Id.* "In the end, whether loss causation has been demonstrated presents a public policy question, the resolution of which is predicated upon notions of equity because it establishes who, if anyone, along the causal chain should be liable for the plaintiffs' losses." *Id.* (*citing AUSA Life Ins. Co. v. Ernst & Young,* 206 F.3d 202, 217 (2d Cir.2000)). Such finding must conform to "a rough sense of justice." *Id.* (*citing Palsgraf v. L.I.R.R. Co.,* 248 N.Y. 339, 352, 162 N.E. 99 (1928) (Andrews, J., dissenting)).

### 1. Brightstreet investment

Emergent has sufficiently alleged loss causation for the first alleged misrepresentation regarding Brightstreet, and Stonepath does not appear to contest this point. Emergent alleges that the fact that NETV's investment in Brightstreet was $4 million and not $14 million "caused a great disparity between the real value of the NETV shares and the price that defendants induced plaintiff to pay for them." The actual aggregate value of all of NETV's investments was less than 40% of the amount represented by Stonepath. Moreover, the shares that Emergent pur-

chased were restricted and thus could not be sold without registration. By the time Emergent was able to sell the shares, the market price was far less than what Emergent had paid. That market price likely reflected the fact that NETV did not have as great an amount invested as they represented. Therefore, Emergent has sufficiently alleged loss causation with respect to the alleged misrepresentation concerning the Brightstreet investment.

### 2. *Appel's Relations with Panzo and NETV*

■ Emergent claims that it alleges a kind of loss found sufficient in *Suez Equity* as a result of Appel's relations with Panzo and NETV. The *Suez Equity* court identified two losses: (1) the plaintiff's loss at the time of purchase, due to the decreased "investment quality" of the stock, and (2) the eventual loss due to the group's financial failure.

There is no question that Emergent has failed to allege facts sufficient to prove the latter loss. Stonepath is correct that to do so, Emergent would have to allege a causal connection between Appel's purported connections with Panzo and NETV and the eventual decline in stock price. Emergent has not done so.

Whether Emergent has alleged the first type of loss, loss of investment quality, presents a closer question. Emergent claims in its amended complaint that "the defendants allegedly concealed a lack of skills and expertise on the part of the company's principal that, if revealed, would directly affect the plaintiff's valuation of their investment in the company." Emergent's amended complaint has alleged, unlike its earlier complaint, that Emergent relied on Panzo's "experience, judgment, management, business skill, character and honesty" in assessing the merits of its investment in Stonepath, and that Panzo's alleged relationship with Ap-

pell was not disclosed. Further, Emergent alleges that the failure to disclose Panzo's prior investment history "induced a disparity between the purchased price and real value" of Stonepath's stock and caused Emergent to evaluate incorrectly Panzo's competency to lead the company. These allegations are sufficient to state a claim for loss of investment quality.

Stonepath reads *Suez Equity* to require that the securities be deemed "worthless" at the time of acquisition in order to establish a claim of loss of investment quality, and that Emergent failed to so aver. However, in discussing prior case law on the topic, the Court defined loss of investment quality to be that which occurs when "a reasonable investor would presumably accord less deference to a trainee than it would to a broker when valuating a recommended stock." 250 F.3d at 98. Similarly, a loss of investment quality occurred when the concealment of a lack of skills and expertise on the part of the company's principal, if revealed, "would directly affect the plaintiffs' valuation of their investment in the company." *Id.* The Court did not require the plaintiffs to have valued the investment as worthless.

If Emergent had known about Panzo's long history of involvement in what they allege to be "pump and dump" schemes with Appel, a person barred for life from the securities industry, and that Appel was involved in NETV, it is reasonable to assume that they would have valuated their investment in the company much differently. That is sufficient to survive this motion to dismiss. However, Emergent is limited to damages for its loss of "investment quality" if this claim survives.

### B. *Reasonable Reliance*

Under both New York and the federal securities laws, reasonable reliance is a necessary element for establishing a fraud

claim. *Harsco Corp. v. Segui*, 91 F.3d 337, 342 (2d Cir.1996) (*citing, inter alia, Azrielli v. Cohen Law Offices*, 21 F.3d 512, 517 (2d Cir.1994) and *Channel Master Corp. v. Aluminium Ltd. Sales, Inc.*, 4 N.Y.2d 403, 407, 176 N.Y.S.2d 259, 151 N.E.2d 833 (1958)). Thus, in order to succeed on any of its three claims, Emergent must allege reasonable reliance.

This Court previously held that Emergent could not as a matter of law reasonably rely on any statement that was not incorporated into the fully integrated Stock Purchase Agreement. *Emergent*, 165 F.Supp.2d at 625. Emergent's sophistication, the unambiguous terms of the Stock Purchase Agreement including the integration clause, and Emergent's access to financial information and other information concerning Stonepath were used in reaching this conclusion.

Emergent has not amended its complaint so as to avoid this problem—and indeed, it is difficult to see how it could amend its complaint to do so in light of the earlier holding. Thus the second amended complaint must be dismissed unless the holding that the unambiguous terms of the Stock Purchase Agreement bars a claim of fraud based on oral or written representations is reversed or otherwise amended.

■ Under New York law, "where a party specifically disclaims reliance upon a particular representation in a contract, that party cannot, in a subsequent action for common law fraud, claim it was fraudulently induced to enter into the contract by the very representation it has disclaimed reliance upon." *Harsco*, 91 F.3d at 345 (*citing Danann Realty Corp. v. Harris*, 5 N.Y.2d 317, 184 N.Y.S.2d 599, 157 N.E.2d 597 (1959)); *accord Manufacturers Hanover Trust Co. v. Yanakas*, 7 F.3d 310, 315 (2d Cir.1993). This rule, enunciated by the New York Court of Appeals in *Danann Realty*, applies also in the securities fraud context. *Harsco*, 91 F.3d at 345 (*citing*

*Brown v. E.F. Hutton Group, Inc.*, 991 F.2d 1020, 1033 (2d Cir.1993)).

■ In order to invoke the rule from *Danann Realty*, however, the clause at issue must contain an adequately specific, as opposed to general, disclaimer. *Chavin v. McKelvey*, 25 F.Supp.2d 231, 235 (S.D.N.Y.1998); *Tempo Shain Corp. v. Bertek, Inc.*, 120 F.3d 16, 21 (2d Cir.1997) ("A general merger clause does not preclude parol testimony where a claim is based on fraud in the inducement."); *Yanakas*, 7 F.3d at 316 ("[T]he touchstone is specificity."). To be adequately specific, a clause "must contain specific disclaimers of the particular representations that form the basis of the fraud-in-the-inducement claim." *Yanakas*, 7 F.3d at 316; *O'Hearn v. Bodyonics, Ltd.*, 22 F.Supp.2d 7, 13 (E.D.N.Y.1998) ("A specific disclaimer typically consists of a clause stipulating that the parties are not 'relying' upon specified, extra-contractual representations."). Even in the absence of a specific disclaimer, a fraudulent inducement claim will be barred whenever "an express provision in a written contract contradicts the claimed oral representations in a meaningful fashion." *Bango v. Naughton*, 184 A.D.2d 961, 584 N.Y.S.2d 942, 944 (N.Y.App.Div.1992); *accord Manufacturers Hanover Trust Co. v. Yanakas*, 7 F.3d 310, 317–18 (2d Cir. 1993); *M.H. Segan Ltd. Partnership v. Hasbro, Inc.*, 924 F.Supp. 512, 527 (S.D.N.Y.1996).

The rationale behind this well-settled rule is that it is unfair to permit a party to claim fraudulent inducement after it plainly and deliberately announces that it is not relying on these representations when signing the contract. *Citibank v. Plapinger*, 66 N.Y.2d 90, 95, 495 N.Y.S.2d 309, 485 N.E.2d 974 (1985). A contrary rule would allow the party claiming fraud to benefit from its own deliberate misrepresentation when placing its signature on a specific

merger clause. *Id.; Stanley v. Bray Terminals Inc.,* 197 F.R.D. 224, 228 (N.D.N.Y. 2000).

Thus, a general merger clause "stating that the signatories acknowledge the written document supersedes all prior agreements and constitutes the sole embodiment of their obligations" does not bar an action for fraud. *O'Hearn,* 22 F.Supp.2d at 13; *Yanakas,* 7 F.3d at 316–17 (collecting cases); *Citibank v. Plapinger,* 66 N.Y.2d 90, 94–95, 495 N.Y.S.2d 309, 485 N.E.2d 974 (1985). By contrast, when a signatory explicitly disclaims reliance on the subject of the allegedly fraudulent statement, or when the contract states that the defendant makes no representations other than those contained in another more exhaustive clause of the contract, a fraud claim may be precluded. *Harsco,* 91 F.3d at 345–47; *Yanakas,* 7 F.3d at 317.

In order to determine whether Emergent can claim to have reasonably relied on the alleged misrepresentations, it is necessary to determine if the merger clause is specific or general. The merger clause provides the usual boilerplate language:

> This Agreement, together with the exhibits and schedules hereto and ancillary Agreements, contains the entire understanding and agreement between or among any of them, and supersedes all prior understandings or agreements between or among any of them with respect to the subject matter hereof.

If this merger clause stood alone, there would be no question that it would not by itself preclude reasonable reliance as a matter of law. In addition to the merger clause, however, the Stock Purchase Agreement makes 29 separate representations and warranties and 16 separate covenants in favor of the series C purchasers, including Emergent. Further, one of the representations states:

> No representation or warranty by the Company in this Agreement, in any schedule to this Agreement, or in the Ancillary Agreements, contains or will contain any untrue statement of a material fact or omits or will omit to state a material fact required to be stated herein or therein or necessary to make the statements contained herein or therein not false or misleading. There is no fact or circumstance relating specifically to the current business operations or condition of the Company that could reasonably be expected to result in a Material Adverse Effect[2] that is not disclosed in a Schedule attached hereto.

Stock Purchase Agreement, § 2.29. Most of the cases cited by Emergent do not involve contracts containing such comprehensive representations, warranties, and covenants.[3]

---

**2.** Section 9.1 defines "Material Adverse Effect" to be a material adverse effect on the condition (financial or otherwise), operations, business, assets, or prospects of the Company, or on its ability to consummate the transactions hereby contemplated.

**3.** *E.g. Tempo Shain Corp. v. Bertek, Inc.,* 120 F.3d 16, 21 (2d Cir.1997) (discussion of merger clause but no other representations in case concerning contractual dispute between production company and manufacturer turning on arbitrator's decision not to bar certain testimony as cumulative); *Four Finger Art*

*Factory, Inc. v. DiNicola,* No. 99 Civ. 1259, 2001 WL 21248, at *4 (S.D.N.Y. Jan.9, 2001) (same in case concerning contract rights pursuant to book promotion); *Greenfield v. Shapiro,* 106 F.Supp.2d 535, 539 (S.D.N.Y.2000) (same in case involving real estate contract); *Stanley v. Bray Terminals, Inc.,* 197 F.R.D. 224, 228–29 (N.D.N.Y.2000) (same in case involving claims between mortgagee and mortgagor); *In re Matterhorn Group,* 2000 WL 1174215, at *6 (Bankr.S.D.N.Y. Aug.17, 2000) ("[T]he license agreements do not contain disclaimers.").

It is true that the merger clause here does not, as *Harsco* seems to require, specifically state that NETV makes no representations other than those contained in the sections of the purchase agreement concerning NETV's representations, warranties, and covenants. *Harsco*, 91 F.3d at 345. Yet the merger clause does establish that the contract comprises the entire understanding and agreement between the parties, and part of that "entire understanding and agreement" are the sections detailing the representations, warranties and covenants provided by NETV. In addition, § 2.29 specifically states that there is nothing false or misleading in the purchase agreement, nor any omissions relating to the current business operations or condition of the Company that could result in a Material Adverse Effect. Presumably, the smaller investment in Brightstreet and the inexperience or alleged dubious past of a principal should be included as these allegations involve "current business operations" and could lead to a "Material Adverse Effect."

Moreover, the Stock Purchase Agreement is the product of extensive negotiation and review by sophisticated investors. *Harsco*, 91 F.3d at 345. This is of particular impact in Emergent's claim of misrepresentation regarding the Brightstreet investment. Courts have dismissed claims where parties taking part in sophisticated transactions were aware of material facts and failed to ensure that they were present in the relevant contracts. *Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1543 (2d Cir.1997) ("We believe that the failure to insert such language into the contract—by itself—renders reliance on the misrepresentation unreasonable as a matter of law."); *Rodas v. Manitaras*, 159 A.D.2d 341, 552 N.Y.S.2d 618, 620 (N.Y.App.Div.1990) ("[W]here as here, a party has been put on notice of the existence of material facts which have not been documented and he nevertheless proceeds with a transaction without securing the available documentation or inserting appropriate language in the agreement for his protection, he may truly be said to have willingly assumed the business risk that the facts may not be as represented. Succinctly put, a party will not be heard to complain that he has been defrauded when it is his own evident lack of due care which is responsible for his predicament."). Waldron reviewed the draft Stock Purchase Agreement prior to closing. Both he and Yun had received oral and written assurances of the amount of money NETV had allegedly invested in Brightstreet. Given the extensive and comprehensive sections detailing the representations, warranties and covenants, Emergent should have ensured that this representation was also covered.

Therefore Stonepath's motion to dismiss the claims is granted without leave to amend.[4]

---

4. Fed.R.Civ.P. 15(a) requires that "leave [to amend] shall be freely given when justice so requires." *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). When a motion to dismiss is granted, "the usual practice is to grant leave to amend the complaint." 2A Moore & Lucas, Moore's Federal Practice ¶ 12.14 at 12–99 (2d ed.1989); *see also Luce v. Edelstein*, 802 F.2d 49, 56 (2d Cir.1986) (same rule for complaints dismissed under Rule 9(b)). Although the decision whether to grant leave to amend is within the discretion of the district court, refusal to grant leave must be based on a valid ground. *Foman*, 371 U.S. at 182, 83 S.Ct. 227. Here, Emergent has had one opportunity to amend its complaint and submitted substantially the same complaint, which again fails to allege reasonable reliance. Therefore, there is no need to give Emergent the opportunity to submit a fifth amended complaint alleging similar claims that simply are not viable.

## CONCLUSION

Stonepath's motion to dismiss is granted, and Emergent's amended complaint is dismissed without leave to amend.

It is so ordered.