In re: MERRILL LYNCH & CO.,
INC. RESEARCH REPORTS
SECURITIES LITIGATION

This Document Relates to: In re Merrill
Lynch & Co., Inc. Global Technology
Fund Securities Litigation, 02-cv-
7854(MP)

No. 02 MDL 1484.

United States District Court,
S.D. New York.

July 2, 2003.

Decision and Order Denying Motions
to Alter Judgment and Amend
Complaint Aug. 19, 2003.

Wolf Haldenstein Adler Freeman & Herz, LLP (by Daniel W. Krasner, Jeffrey G. Smith and Stefanie A. Lindeman), New York, New York, for Plaintiffs.

Swidler Berlin Shereff Friedman, LLP (by Andrew J. Levander, Joseph F. Donley and Laura Proctor), New York, New York, for Defendant Merrill Lynch Global Technology Fund, Inc.

Clifford Chance U.S. LLP (by James N. Benedict, Mark Holland, Mary K. Dulka and Jennifer Wendy), New York, New York, for Defendants Merrill Lynch Investment Managers, L.P. (f/k/a Merrill Lynch Asset Management, L.P.), FAM Distributors, Inc. (f/k/a Merrill Lynch Funds Distributor), Princeton Services, Inc., Terry K. Glenn, Donald C. Burke and Arthur Zeikel.

Merrill Lynch Investment Managers, L.P. (by Lori A. Martin, First Vice President and Assistant General Counsel), Plainsboro, New Jersey, for Defendants Merrill Lynch Investment Managers, L.P. (f/k/a Merrill Lynch Asset Management, L.P.), FAM Distributors, Inc. (f/k/a Merrill Lynch Funds Distributor), Princeton Services, Inc., Terry K. Glenn, Donald C. Burke and Arthur Zeikel.

Bressler, Amery & Ross (by Hugo A. Hilgendorff IV and David J. Libowsky), New York, New York, for Defendants Donald Cecil, Roland M. Machold, Edward H. Meyer, Charles C. Reilly, Richard D. West, Edward D. Zinbarg, Roscoe S. Suddarth, Ronald W. Forbes, Cynthia A. Montgomery, and Kevin A. Ryan.

Bass Berry & Sims PLC (by James H. Cheek III, Michael L. Dagley and Matthew M. Curley), Nashville, Tennessee, for Defendants Donald Cecil, Roland M. Machold, Edward H. Meyer, Charles C. Reilly, Richard D. West, Edward D. Zinbarg, Roscoe S. Suddarth, Ronald W. Forbes, Cynthia A. Montgomery, and Kevin A. Ryan.

Skadden, Arps, Slate, Meagher & Flom LLP (by Jay B. Kasner, Edward J. Yodowitz, Scott D. Musoff and Joanne Gaboriault), New York, New York, for Defendants Merrill Lynch & Co., Inc. and Merrill Lynch, Pierce, Fenner & Smith Incorporated.

## DECISION AND ORDER

MILTON POLLACK, Senior District Judge.

The case before this Court is yet another of the consolidated lawsuits which followed the New York Attorney General's investigation into certain notorious aspects of the internal operations of prominent Wall Street securities firms. The case is, however, one removed from those brought

against Merrill Lynch analysts for their widely broadcast, and ultimately erroneous, predictions of future target prices for speculative securities in the technology sector. This action is not against the analysts responsible for these predictions, but against a proprietary mutual fund that invested in the common stock of companies in the technology sector, including companies covered by the Merrill Lynch analyst reports.

Plaintiff, a shareholder in the Merrill Lynch Global Technology Fund (the "Fund"), brings this action against the Fund, its directors, its investment adviser and affiliates, and the adviser's corporate parent, Merrill Lynch & Co., Inc. ("ML & Co."), and broker-dealer affiliate, Merrill Lynch, Pierce, Fenner & Smith Incorporated ("MLPF & S"). Plaintiff alleges that the Fund's Registration Statements and Prospectuses failed to disclose several material facts.

The "material facts" that Defendants allegedly failed to disclose fall into three categories. (*See e.g.*, Compl. ¶¶ 15, 213.)[1] First, that the Fund invested in the securities of companies with which MLPF & S had or sought investment banking business. (*See e.g.*, Compl. ¶¶ 15(1), (2), (3)). Second, that MLPF & S issued purportedly misleading research reports on many of the securities held in the Fund's portfolio. (*See e.g.*, Compl. ¶¶ 15(4)-(10)). Third, that the Fund invested in companies at market prices inflated by the misleading research reports "in order to enhance [MLPF & S's] ability to obtain investment banking business from those companies, without regard to whether they were good investments for investors in the Fund." (*See e.g.*, Compl. ¶¶ 15(11)-(15).)

The alleged conflict of interest between brokerage firms, investment bankers and research analysts that underlies the entire complaint was a matter of public knowledge for years before the amazing boom of the market initially rewarded those who disregarded such caveats. It was also public knowledge that the Fund included stocks covered by the Merrill Lynch analysts' research reports.

The additional allegation that the Fund took part in a scheme to invest disproportionately in stocks covered by Merrill Lynch research reports to the detriment of the Fund is equally insufficient to state a claim. Moreover, the Fund stated clearly in its Prospectus that it sought capital appreciation by investment in market leaders or potential leaders in the technology sector. Plaintiff has not alleged any facts demonstrating that the companies held by the Fund did not satisfy these criteria. Nor has Plaintiff alleged facts that would show that this alleged "scheme" caused concomitant loss of Fund value, or that participants in this "scheme" acted with scienter—essential elements of a federal securities law claim.

## I. THE PARTIES

Lead Plaintiff Michal N. Merritt purchased shares of the Fund in January and February of 2000. (Compl. ¶ 24.) She seeks to represent all persons who purchased shares of the Fund between October 2, 1999 and October 1, 2002. (Compl. ¶ 1.) Plaintiff filed her lawsuit on October 1, 2002.

The Complaint conflates the various corporate Defendants into a single entity characterized as the "ML Defendants" in an attempt to attribute knowledge or conduct by any one Defendant to all the other Defendants. (*See e.g.*, Compl. ¶ 5.) However, the named Defendants actually com-

---

1. All references to the Complaint herein, unless otherwise noted, are to Plaintiff's Consolidated Amended Complaint dated March 14, 2003.

prise several distinct corporations and individuals.

The Fund is a diversified open-end investment company registered with the U.S. Securities and Exchange Commission ("SEC") pursuant to the 1940 Act. (Compl.¶¶ 30, 62.)[2] The Fund was first offered to the public in June 1998. The Fund is an aggressive growth product that seeks long-term capital appreciation through worldwide investment in equity securities of issuers that, in the opinion of its investment adviser, Merrill Lynch Investment Managers, L.P. ("MLIM"), derive a substantial portion of their income from products and services in technology related industries. (Compl.¶ 30.) The Fund's main investment strategy is to invest in companies that MLIM believes are leaders in their product or service niches, or are likely to develop leadership positions. (Holland Decl. Ex. A, 1999 Prospectus at 3.)

The Fund's Prospectuses warn that investing in the Fund involves substantial risk. The Prospectuses state that technology related securities "historically have been very volatile" which "increases the risk that the securities may lose value." (See, e.g., id. at 9.) The Prospectuses note that the Fund may invest in smaller companies which "may be less financially secure than larger, more established companies," and that as a result "such companies may be subject to abrupt or erratic price movements and more unpredictable price changes than the stock market as a whole." (Id.) In addition, the Prospectuses state that technology related compa-nies "may face special risks that their products or services may not prove to be commercially successful" or "may rapidly become obsolete." (Id.)

Defendant MLIM (formerly known as Merrill Lynch Asset Management, L.P.), the Fund's investment adviser, is an asset management company with its headquarters in Princeton, New Jersey. (Id. at 31.) Pursuant to its advisory agreement with the Fund, MLIM received a fee for managing the Fund, paid at the annual rate of 1% of the Fund's average daily net assets not exceeding $1 billion and 0.95% of the Fund's average daily net assets in excess of $1 billion. (Id. at 29.) MLIM is an indirect, wholly-owned subsidiary of Defendant ML & Co.

Defendant Princeton Services, Inc. is a subsidiary of ML & Co. and the general partner of MLIM. (See Holland Decl. Ex. B, 1999 SAI at 17.) Defendant FAM Distributors, Inc. (formerly known as Merrill Lynch Funds Distributor, Inc.) distributed shares of the Fund. (Compl.¶ 32.)

Defendants Arthur Zeikel, Terry Glenn and Donald Burke are present or former executives of MLIM who served as directors and/or officers of the Fund during part or all of the Class Period. The ten other individual defendants served as independent directors of the Fund during part or all of that time. (Compl.¶¶ 38–50.)

Defendant ML & Co. is a Delaware corporation that, through its subsidiaries and affiliates, provides financial services

2. Plaintiff's Complaint expressly incorporates by reference the Fund's Prospectuses and Statements of Additional Information ("SAIs"). (Compl.¶ 66.) Those documents were filed with the SEC and are publicly available. The Court may properly consider them on this motion to dismiss. *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773–74 (2d Cir.1991). Copies of the 1999 Prospectus and SAI are attached to the Declaration of Mark Holland dated May 15, 2003 ("Holland Decl.") as Exhibits A and B. As Plaintiff's Complaint acknowledges, the language in the 2000, 2001 and 2002 Prospectuses and SAIs is "essentially verbatim" to that in the 1999 materials. (See, e.g., Compl. ¶¶ 202–211.)

on a global basis. (Compl.¶ 28.) Defendant MLPF & S is a securities broker-dealer and investment bank with its headquarters in New York, New York. MLPF & S is a wholly-owned subsidiary of ML & Co. (Compl.¶ 29.)

Apart from their common ownership by ML & Co., MLPF & S and MLIM are entirely separate. They are in different businesses and are subject to different principal regulatory structures—the 1940 Act for MLIM, and the 1934 Act for MLPF & S. Plaintiff does not allege that MLPF & S and MLIM share management, employees, or offices. Nor does she allege any cross-ownership between them.

## II. THE CLAIMS

The Complaint contains six counts. Counts I and II allege violations of Sections 11 and 12(a)(2) of the Securities Act of 1933 ("1933 Act"), 15 U.S.C. §§ 77k, *l*(a)(2), respectively. (Compl.¶¶ 223–268.) Plaintiff also asserts claims in those Counts for control person liability under Section 15 of the 1933 Act, 15 U.S.C. § 77*o*. (Compl.¶¶ 241–245, 264–268.) Count III alleges a violation of Section 34(b) of the Investment Company Act of 1940 ("1940 Act"), 15 U.S.C. § 80a–33(b), and also asserts control person liability under the 1940 Act. (Compl.¶¶ 269–279.) Counts IV and V allege violations of Section 10(b) of the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C. § 78b, and SEC Rule 10b–5. (Compl.¶¶ 280–339.) Finally, Count VI asserts control person liability under Section 20(a) of the 1934 Act, 15 U.S.C. § 78t. (Compl.¶¶ 340–346.)

**3.** To the extent that Plaintiff characterizes sections of the offering materials as "misstatements," this characterization is based solely on the alleged omissions from these materials and will be dealt with herein as omissions.

## III. DISCUSSION

### A. Sections 11 and 12(a)(2) of the 1933 Act

#### 1. *Defendants had no Duty to Disclose the Allegedly Omitted Information*

■ To state a claim under Sections 11 and 12(a)(2), a plaintiff must allege that the defendants had a legal obligation to disclose the allegedly omitted information. *See* 15 U.S.C. §§ 77k, *l*(a)(2); *In re Ultrafem Securities Litig.*, 91 F.Supp.2d 678, 699 (S.D.N.Y.2000) (dismissing Sections 11 and 12(a)(2) claims where the plaintiffs failed to demonstrate that the defendants were obligated to disclose the omitted language); *Geiger v. Solomon–Page Group, Ltd.*, 933 F.Supp. 1180, 1187–88 (S.D.N.Y. 1996) (dismissing Sections 11 and 12(2) claims because the defendants were not required to disclose allegedly omitted information); *accord Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1189 (11th Cir.2002) ("[t]o avoid dismissal of a section 11 omission claim, plaintiffs must properly allege ... [that] defendants were under a duty to disclose the omitted material information"). Plaintiff has failed to plead facts sufficient to show that the Defendants had a duty to disclose the information allegedly omitted from the Fund's Prospectuses and Registration Statements.[3]

#### a. *Defendants had no Duty to Disclose that the Fund invested in the securities of companies with which MLPF & S had an investment banking relationship.*

■ The first fault claimed is that Defendants failed to disclose that the Fund's

*See Primavera Familienstiftung v. Askin*, No. 95 Civ. 8905(RWS), 1996 WL 494904, at *7 (S.D.N.Y. Aug.30, 1996) ("[T]he Complaint is, regardless of how it is framed, one of misrepresentation....").

broker-dealer affiliate provided investment banking services to companies in which the Fund invested. Yet Plaintiff has not and cannot identify any SEC regulation or other legal authority that would require a mutual fund to disclose that information.

First, the information required to be disclosed in mutual fund registration statements and prospectuses is specifically set forth in SEC Form N–1A. Among other things, Form N–1A requires disclosure about investment strategies and risk, management, organization, capital structure, and distribution arrangements. No portion of Form N–1A requires the disclosure of the investment banking relationships between the companies whose stocks were purchased by a fund and the broker-dealer affiliate of the fund's investment adviser.

The absence of such a requirement is not surprising. It has been well-recognized for decades that many mutual fund investment advisers are affiliated with broker-dealers and investment banks. *See generally Gartenberg v. Merrill Lynch Asset Mgmt., Inc.*, 528 F.Supp. 1038, 1040–42 (S.D.N.Y.1981) (Pollack, J.), *aff'd*, 694 F.2d 923 (2d Cir.1982). Indeed, Section 17 of the 1940 Act, entitled, "Transactions of Certain Affiliated Persons and Underwriters," specifically recognizes that mutual fund investment advisers may be affiliated with broker-dealers, and regulates in considerable detail the circumstances under which the affiliated entities may, and may not, transact business. *See* 15 U.S.C. § 80a–17.[4] The SEC has also promulgated extensive rules pursuant to Section 17. *See* 17 C.F.R. §§ 270.17a–1—270.17j–1. Despite this extensive congressional and regulatory oversight, no statute or rule requires the type of disclosure Plaintiff advocates here.

In an analogous context, the court in *In re Digital Island Sec. Litig.*, 223 F.Supp.2d 546 (D.Del.2002), found no duty to disclose the alleged omission under the federal securities laws. In that case, the plaintiffs brought a securities class action following the acquisition of Digital Island, Inc. The plaintiffs alleged that the defendants had violated Section 14(e) of the 1934 Act by failing to disclose in tender offer documents several agreements that Digital Island had with third parties. *See id.* at 551. The court granted the defendants' motion to dismiss, reasoning that the defendants had no duty under any SEC regulation or authority to disclose deals Digital Island had with customers. *See id.* at 552. The court found it significant that the information required to be included in documents concerning tender offers and solicitations related to tender offers was specifically set forth in two SEC regulations, and no portion of those regulations required the disclosure of the agreements at issue. *See id.; accord Geiger*, 933 F.Supp. at 1187–88 ("[t]he fact that the SEC does not require disclosure" of the omitted fact "is further support for this conclusion" that the alleged omission did not give rise to liability under Sections 11 and 12(a)(2) because "it reflects the SEC's expert view that such disclosure is not required").

Second, the Defendants cannot be held liable for failing to disclose that MLPF & S provided investment banking services to companies in the Fund's portfolio if that information was already public. Sections 11 and 12(a)(2) do not require the disclo-

---

4. Indeed, Congress has recognized that such affiliations may benefit mutual fund shareholders. In the 1980 Amendments to the 1940 Act, which were modeled on Section 17, Congress "create[d] special procedures designed to facilitate various types of *beneficial* *dealings* between business development companies and their affiliates." Small Business Investment Incentive Act of 1980, H.R.Rep. No. 96–1341, 96th Cong., 2d Sess. at 4514 (emphasis added).

sure of publicly available information. *See, e.g., Klein v. Gen. Nutrition Cos.*, 186 F.3d 338, 343 (3d Cir.1999) (where the information was public knowledge, "[f]ederal securities laws do not require a company to state the obvious"); *Wielgos v. Commonwealth Edison Co.*, 892 F.2d 509, 517 (7th Cir.1989) ("It is pointless and costly to compel firms to reprint information already in the public domain"); *Seibert v. Sperry Rand Corp.*, 586 F.2d 949, 952 (2d Cir.1978) ("Although the underlying philosophy of federal securities regulations is that of full disclosure, there is no duty to disclose information to one who reasonably should already be aware of it.") (internal citations omitted).

Here, Plaintiff's own Complaint demonstrates that information concerning companies in which the Fund might invest and to whom MLPF & S provides investment banking services was publicly available. Plaintiff has attached to her Complaint an Excel spreadsheet, "Plaintiff's Exhibit 1," which purports to show that "Merrill Lynch performed investment banking services, which resulted in a consummated transaction, for at least 32.7% of the companies whose securities were held by the Fund." (Compl.¶ 133.) Plaintiff explains at length in her Complaint that she obtained information in Plaintiff's Exhibit 1 from a variety of public sources, including SEC filings. (Compl.¶¶ 126–128.) For example, Plaintiff's Exhibit 1 asserts that Merrill Lynch performed investment banking services for Doubleclick, and that this was disclosed in a February 17, 2000 Prospectus for Doubleclick that was filed with the SEC. (*See* Pl.Ex. 1 at 8.) Plaintiff's Exhibit 1 also states that the Fund disclosed its investment in Doubleclick in its March 31, 2000 Annual Report that also was filed with the SEC. (*See id.*) Indeed, Plaintiff's Exhibit 1 identifies 66 different companies held by the Fund where publicly-available SEC filings or other public information disclosed that MLPF & S was performing investment banking services for those companies. (*See id.* at 23.) Plaintiff therefore cannot show that such information was concealed from the markets or from Fund investors.

b. *Defendants had no Duty to Disclose that MLPF & S issued purportedly misleading research reports on many of the securities held in the Fund's portfolio.*

The Plaintiff claims that "there were inherent, material conflicts of interest concerning the issuance of Merrill Lynch's research reports, and the relationship between Merrill Lynch's research and investment banking department." (Compl.¶ 14.)

According to the Complaint, the inherently conflicted research reports inflated the market price of the securities of a material number of the companies in the Fund's portfolio, and thus inflated the price paid by the Class when they purchased Fund shares. Plaintiff claims that the Fund, and those associated with the Fund, had a duty to obtain and disclose the underlying conflicts of interest which allegedly made the reports of Merrill Lynch misleading on securities held by the Fund.

Again, this claim fails if for no other reason than because the information regarding the alleged conflict of interest was public knowledge, and had been for years. As early as September 9, 1995, the Toronto Financial Post carried an article stating that conflicts of interest between underwriting and analysts in brokerage firms were becoming endemic. The Post noted that after deregulation in 1987, commission income earned by brokerage houses collapsed, and underwriting fees became essential for brokerage firm profits. Among the conflicts described was the fact that analysts' bonuses were based on revenue

generated by underwriting. *See* Rod McQueen, The Endangered Species, The Financial Post (Toronto, Canada), Sept. 9, 1995.[5]

In May of 1996, The Wall Street Journal also pointed out the potential for conflict, stating that investment banks "have persuaded clients to hire underwriters on the basis of their analysts' selling power" and that "[i]n turn, the analyst's worth is increasingly dependent on his or her ability to bring in deals." The article ends with the admonition that "investors, journalists and others who deal with the Street would do well to keep in mind that, often times, the analyst is wearing two hats." *See* Roger Lowenstein, Today's Analyst Often Wears Two Hats, The Wall Street Journal, May 2, 1996.

Soon thereafter, The Boston Globe pointed out that analysts are often over-optimistic about long-term earnings forecasts for equity offerings because "the relationship between the analysts and the investment banking business ... pays their bills." The Globe warns that the mounting evidence suggests that you "trust [analysts] at your peril." *See* Steve Baily & Steven Syre, Taking Analysts' Tempting Forecasts with Grain of Salt, The Boston Globe, October 23, 1996.

The Wall Street Journal beats this drum again in 1998, pointing out that cautious investors would be "hard-pressed to scare up a bearish research report telling them which shares to dump." Of 2,066 ratings, 68% were "buys" or "strong buys," 31% were holds and less than 1% were "weak sells" or "strong sells." The reason for this bullish "speak no evil policy"? The

Journal points out that analysts often won't issue a "sell" because they "don't like to anger companies that could be their firm's investment-banking clients." *See* John Hechinger, Heard in New England: Analysts May Hate to Say "Sell," But a Few Companies Do Hear It, The Wall Street Journal, Apr. 8, 1998.

These are but a small part of the many articles detailing the conflicts of interest that the Plaintiffs have alleged that Defendants concealed in the prospectuses. Others include: Jeffrey Laderman, Who Can You Trust?, Business Week, Oct. 5, 1998 ("brokerage firms are not about to break up the money machine that pairs analysts with dealmakers. And analysts are not about to risk offending the companies they cover. Woe to the investor who doesn't keep these two ideas in mind before investing on a stock recommendation."); Frog Spawn, The Economist, Apr. 17, 1999 (Sell is a four-letter word); SEC Chairman Aurthur Levitt, Address at the Investors' Town Meeting, Albuquerque, New Mexico (Nov. 20, 1999) ("analysts' paychecks are typically tied to the performance of their employers. You can imagine how unpopular an analyst would be who downgrades his firm's best client. Is it any wonder that today, a 'sell' recommendation from an analyst is as common as a Barbara Streisand concert?"); Erick Schonfeld, The High Price of Research, Fortune, Mar. 20, 2000 ("Analysts of all stripes ... increasingly derive a portion of their compensation, directly or indirectly, from the companies they cover."); Robert Samuelson, Newseek, Apr. 3, 2000 (quoting Professor Jay Ritter as stating that "The con-

---

**5.** "[O]n a motion to dismiss, a court may consider ... 'matters as to which judicial notice may be taken....'" *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir.2002) (quoting *Brass v. American Film Technologies, Inc.*, 987 F.2d 142, 150 (2d Cir.1993)). The Court may take judicial notice of newspaper articles for the fact of their publication without transforming this motion into one for summary judgment. *See In re Sterling Foster & Co., Inc. Securities Litigation*, 222 F.Supp.2d 312, 321 (E.D.N.Y.2002); *Schwenk v. Kavanaugh*, 4 F.Supp.2d 116, 118 (N.D.N.Y.1998).

flicts of interest are immense" and that stock analysts are increasingly "cheerleaders" whose pay depends on the firm's underwriting, which depends on enthusiastic research reports); Eileen Buckley, Holding Analysts Accountable, The Industry Standard, June 12, 2000 ("Research analysts writing recommendations of closely watched Internet stocks routinely face conflicts of interest.").

The above review of publicly available information pertaining to these conflicts is largely superfluous, however. Plaintiff conceded her awareness of this information in her original complaint,[6] when she acknowledged that "sometime during the year 2000, various publications suggested that conflicts of interest were becoming rampant in the broker-dealer industry." (Original Complaint ¶ 53.)[7]

### c. Defendants had no Duty to Disclose that the Fund Invested in Companies to Aid Investment Banking Business for Merrill Lynch

■ The Complaint also fails to allege sufficient facts to support Plaintiff's allegation that the Defendants chose certain companies for the Fund in order to enhance MLPF & S' investment banking business. The only facts Plaintiff cites to support this contention are: (1) MLPF & S performed investment banking services for "at least 38.9 percent" of the companies held in the Fund's portfolio, and (2) MLPF & S issued research reports on "at least 80%, and possibly more than 90%" of the companies held by the Fund. (Compl.¶¶ 140, 149.) The Complaint then concludes:

> The sheer number of these companies in the Fund's portfolio covered by the Merrill Lynch research department *suggests* that the opportunity for the Fund's affiliates to obtain investment banking business was a material consideration in choosing the securities which the Fund would buy.

(Compl. ¶ 150 (emphasis added).)

The allegation that MLPF & S provided investment banking services and issued research reports for many companies in the Fund's portfolio would not support a finding that the Fund's investment managers (MLIM) selected those companies to promote MLPF & S' investment banking business. The Fund invested in the world's leading technology companies. The Fund's investment objective is to seek long term capital appreciation by investing in companies that in MLIM's opinion "derive a substantial portion of their income from products and services in technology related industries." (Holland Decl. Ex. A,

**6.** "Where plaintiff has actual notice of all the information in the movant's papers and has relied upon these documents in framing the complaint the necessity of translating a Rule 12(b)(6) motion into one under Rule 56 is largely dissipated." *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir. 1991).

**7.** The specific contention that Merrill Lynch analysts may have held contrary views regarding the stocks rated appears to have been abandoned at oral argument in favor of the more general allegation that "what was going on was severe conflicts of interest" that "our investors would have wanted to know and were entitled to know." June 23, 2003 Transcript at 37 (stating also that "our case does not require that the analyst reports be false"). To the extent that this claim was not abandoned, it fails because it has not been pleaded with the particularity required by Rule 9(b) or the Reform Act. Moreover, it too was public knowledge and need not have been repeated in the offering documents. *See* David Streitfeld, Analyst with a Knack, The Washington Post, Apr. 2, 2000 ("Going to upgrade, he tells an assistant as he walks out the door at 8:20 p.m. Not that he expects Amazon to go up that much. 'I think it's dead money for a while, but I want to differentiate it from all the pieces of [expletive] we have buys on,' he says cheerfully.").

1999 Prospectus at 3.) MLIM's strategy for achieving this objective was to invest in technology companies that were market "leaders" or that MLIM believed "are likely to develop leadership positions." (*Id.*) Plaintiff has not alleged any facts demonstrating that the companies held by the Fund did not satisfy these criteria. And, as one of the world's largest investment banks, MLPF & S provided investment banking services and issued research reports for many of the world's leading technology companies. That the companies overlap should come as no surprise.

The Complaint does not allege any other facts to support Plaintiff's conclusory "suggestion." Plaintiff concedes that the New York Attorney General proceeding "did not address" the parties' conduct with respect to the proprietary mutual funds. (Compl.¶ 9.) The Complaint does not refer to any documents or e-mails indicating that MLIM portfolio managers considered MLPF & S investment banking business when selecting companies for the Fund. Nor does the Complaint cite any sources, named or anonymous, which purportedly told Plaintiff or her counsel any such thing. The Complaint does not describe how a single investment decision by a MLIM portfolio manager (or any Defendant) was influenced by a desire to enhance MLPF & S investment banking business. It does not identify a single company purchased for the Fund which a MLIM portfolio manager did not think was appropriate. Nor does it explain how a MLIM portfolio manager's compensation depended on enhancing MLPF & S investment banking business.

The single, conclusory allegation that a large overlap between leading technology companies held by the Fund and those covered by MLPF & S "suggests" that MLIM had an improper motive in selecting those companies does not suffice to plead a violation of the 1933 Act. "[C]on-

clusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal" of Section 11 claims. *Oxford Asset Mgmt.*, 297 F.3d at 1191 (dismissing Section 11 claim for failure to plead sufficient facts to support conclusory allegations that omissions in a prospectus were objectively unreasonable). *See also AIG Global Sec. Lending Corp. v. Banc of America Sec. LLC*, 254 F.Supp.2d 373, 382 (S.D.N.Y. 2003) (Koeltl, J.) (dismissing securities fraud claims where "[t]he plaintiffs have failed to allege, in any specific sense, why these representations were in fact fraudulent"); *Soto v. Morgan Stanley Dean Witter & Co.*, 2001 WL 958929 (S.D.N.Y. Aug.21, 2001) (Pollack, J.) (dismissing complaint for failure to plead facts in accordance with Fed.R.Civ.P. 8(a) where plaintiff had merely strung together an "unrestrained litany" of reports, newspaper articles, and market gossip).

In sum, Plaintiff has failed to plead any material omissions that the Defendants had a duty to disclose.

**2. It is Apparent from the Face of the Complaint that Plaintiff May Not Recover Any Losses Alleged Herein.**

It is an affirmative defense under Sections 11 and 12 that if the amounts recoverable represent other than the depreciation in value of the subject security resulting from such part of the prospectus, oral communication, or registration statement, with respect to which the liability of the defendant is asserted then such amount shall not be recoverable. *See* 15 U.S.C.A. §§ 77k(e), *l*(b). Where it is apparent from the face of the complaint that the plaintiff cannot recover her alleged losses, dismissal of the complaint pursuant to Fed.R.Civ.P. 12(b)(6) is proper. *See Pani v. Empire Blue Cross Blue Shield,*

152 F.3d 67, 74 (2d Cir.1998) ("An affirmative defense may be raised by a pre-answer motion to dismiss under Rule 12(b)(6), without resort to summary judgment procedure, if the defense appears on the face of the complaint"); *In re Double-Click, Inc. Privacy Litig.*, 154 F.Supp.2d 497, 508 (S.D.N.Y.2001) (Buchwald, J.) ("a court may properly dismiss a claim on the pleadings when an affirmative defense appears on its face").

Plaintiff's alleged losses stem from the fact that her Fund shares declined in value during the Class Period. (*E.g.*, Compl. ¶¶ 217–221.)[8] Plaintiff contends that the allegedly omitted information concerning investment banking conflicts was first disclosed on April 8, 2002, when the New York Attorney General brought his *ex parte* proceeding. (Compl.¶¶ 7, 8.) However, Plaintiff's alleged "losses" occurred before that disclosure. Prior to April 8, the Fund's net asset value per share had declined approximately 76.5%, from a high of $32.49 on March 27, 2000 to $7.63 on April 5, 2002. (*See* http://finance.yahoo.com/magtx*).[9] (This decline is an amount proportional to the decline in the entire technology sector. For example, the Dow Jones World Technology Index declined during the same period, by – 69.3%.) No portion of that decline can be attributed to the alleged non-disclosure.

*See Akerman v. Oryx Communications, Inc.*, 810 F.2d 336 (2d Cir.1987). Further, Plaintiff does not allege that on April 8, 2002, the Fund held shares in any of the companies mentioned in the New York Attorney General complaint. Thus, any decrease in the share price of those companies after April 8, 2002 would not have affected the Fund's net asset value. The decline in the Fund's price per share therefore cannot be attributed to the non-disclosures underlying Plaintiff's claims.

On point is *Akerman*. There, the Second Circuit affirmed the dismissal of claims under Sections 11 and 12(2) of the 1933 Act on the ground that the plaintiffs could not establish that the alleged accounting misstatements in a prospectus caused any losses. The price of the stock had declined from $4.75 per share at the initial public offering to $3.25 per share by the date the accounting error was disclosed to the public. The Court held that this price decrease of $1.50 per share did not constitute a loss actionable under the 1933 Act because it could not have been caused by misstatements which had not yet been revealed. Under the 1933 Act, "[t]he price decline before disclosure may not be charged to defendants." *Akerman*, 810 F.2d at 342; *accord Beecher v. Able*, 435 F.Supp. 397, 407 (S.D.N.Y.1975) (Mot-

---

**8.** By March 31, 1999, the Fund's total return since inception was approximately 35%. (Holland Decl. Ex. C, 3/31/99 Annual Report at 5.) As of March 31, 2000, the Fund had a positive total return during the preceding year of 118%, compared to the S & P 500's total return of 17.9%. (Holland Decl. Ex. D, 3/31/00 Annual Report at 2.) However, in March 2000 the NASDAQ market index plunged, falling from 3940.35 on January 19, 2000 (when Plaintiff first purchased shares of the Fund) to 2770.38 one year later. (*See* http://finance.yahoo.com; *see also* Compl. ¶ 220.) Like virtually every other equity mutual fund, the Fund's performance suffered as a result. For the year ended March 31, 2001, the Fund had a negative total return, of ap-

proximately –66.0%. (Holland Decl. Ex. E, 3/31/01 Annual Report at 2.)

**9.** The Court may take judicial notice of public quotations of stock prices. *See, e.g., In re Allied Capital Corp. Sec. Litig.*, No. 02 Civ. 3812, 2003 WL 1964184, at *3 (S.D.N.Y. Apr.25, 2003) (Lynch, J.) (stating that on a motion to dismiss, the court may take judicial notice of "well-publicized stock prices") (quoting *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 n. 8 (2d Cir.2000)); *accord Fant v. Perelman*, No. 97 Civ. 8435, 1999 WL 199078 (S.D.N.Y. Apr.9, 1999) (Preska, J.) (closing prices of the relevant securities considered by the court on a motion to dismiss).

ley, J.) (price decline before misstatement revealed not attributable to the defendants under § 11(e)); *Fox v. Glickman Corp.*, 253 F.Supp. 1005, 1010 (S.D.N.Y.1966) (Metzner, J.) (same); *see also Goodridge v. Harvey Group Inc.*, 778 F.Supp. 115, 129 (S.D.N.Y.1991) (Lasker, J.) (section 12(2) claim "cannot prevail" where the plaintiff "failed to show that it suffered cognizable damages as a result of the material misrepresentations and omissions made").

Like the plaintiffs in *Akerman*, Plaintiff here alleges that she has sustained a loss by pointing to declines in the price of her Fund's shares which occurred *before* public disclosure of the allegedly concealed information. Such price declines may not be charged to Defendants under Section 11 or Section 12(a)(2). *See Akerman*, 810 F.2d at 341–43.[10] For this reason, as well, Plaintiff's 1933 Act claims fail.

### 3. Plaintiff has Failed to Allege a Direct Purchase from the Defendants

■ The Plaintiff's claim against the Defendants under Section 12(a)(2) of the Securities Act also fails because plaintiff has not sufficiently alleged that she purchased the mutual fund shares directly from any of the Defendants.

An essential element of a Section 12(a)(2) claim is that the plaintiff purchased his/her shares directly from a seller who makes use of a false or misleading prospectus. *See Pinter v. Dahl*, 486 U.S. 622, 643–47 & n. 21, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988). Under Section 12(a)(2), "only a defendant from whom the plaintiff purchased securities may be liable." *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 49 (2d Cir.1991). Plaintiff does not allege that she purchased

Global Technology Fund shares from a Merrill Lynch broker or that the Fund was sold exclusively through Merrill Lynch brokers.

It is axiomatic that a putative class representative must be able to individually state a claim against defendants, even though he or she purports to act on behalf of a class. *See In re Delmarva Sec. Litig.*, 794 F.Supp. 1293, 1309 (D.Del.1992) (dismissing Section 12(a)(2) claim where class plaintiffs lacked individual standing to assert claims against defendants); *see also Warth v. Seldin*, 422 U.S. 490, 502, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) (standing requirement not met by alleging "that injury has been suffered by other, unidentified members of the class to which [plaintiffs] belong and which they purport to represent"); *In re VeriFone Sec. Litig.*, 784 F.Supp. 1471, 1489–90 (N.D.Cal.1992) (dismissing class claim where no named plaintiff had standing to bring claim personally), *aff'd*, 11 F.3d 865 (9th Cir.1993).

### B. Section 34(b) of the 1940 Act

Plaintiff's Section 34(b) claim under the 1940 Act fails because there is no private right of action under Section 34(b) and because her claims must be asserted derivatively, rather than directly. Moreover, Defendants had no duty to disclose the information allegedly omitted from the offering materials.

### 1. Section 34(b) Does Not Provide A Private Right Of Action

### a. Contemporaneous Congressional Intent Is Required To Create An Implied Right Of Action

■ The 1940 Act does not create an express cause of action under Section 34(b)

---

**10.** Although *Akerman* was decided on summary judgment, its legal principal is not limited to that procedural context. This Court may dispose of Plaintiff's Section 11 and

12(a)(2) claims at this stage based on the dispositive assertion by Plaintiff that the fraud was not revealed until the New York Attorney General's *ex parte* report.

for private litigants. Hence, in order for plaintiff to have standing under Section 34(b), this Court must find that Congress intended to create an implied private right of action in that Act. Because there is no basis to conclude Congress so intended, plaintiff's claim under Section 34(b) must be dismissed. *Dorchester Investors v. Peak Int'l Ltd.*, 134 F. Supp 2d. 569 (S.D.N.Y.2001).

The Supreme Court has held that in deciding whether an implied right of action exists, the courts must determine "whether Congress intended to create the private remedy asserted." *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 15–16, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979) (holding no implied private right of action for damages exists under Section 206 of the Investment Advisers Act of 1940 ("Advisers Act")); *accord Touche Ross & Co. v. Redington*, 442 U.S. 560, 571, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979) (no implied private cause of action under Section 17(a) of the 1934 Act); *see also Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994) (no implied right of action for aiding and abetting violations of SEC Rule 10b–5).

In *Alexander v. Sandoval*, 532 U.S. 275, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001), the Supreme Court reiterated the importance of contemporaneous Congressional intent:

> The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy [citing *Transamerica*]. Statutory intent on this latter point is deter-

minative. . . . Without it, a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the statute.

*Id.* at 286–87, 121 S.Ct. 1511. Indeed, the Supreme Court has unambiguously "retreated from [its] previous willingness to imply a cause of action where Congress has not provided one." *Correctional Services Corp. v. Malesko*, 534 U.S. 61, 67 n. 3, 122 S.Ct. 515, 151 L.Ed.2d 456 (2001).

Courts in this circuit have applied these pronouncements in holding that no private right of action exists under Sections 26(f) and 27(i) of the 1940 Act. *See Olmsted v. Pruco Life Ins. Co. of New Jersey*, 283 F.3d 429, 432 (2d Cir.2002), *aff'g* 134 F. Supp 2d. 508 (E.D.N.Y.2000) (Garaufis, J.).[11] In refusing to find a private right of action under those sections, the District Court in *Olmsted* stated that "[i]n view of [the 1940 Act's] comprehensive enforcement provisions expressly designating the SEC as the regulatory entity, it is highly improbable that 'Congress absentmindedly forgot to mention an intended private action' as a supplemental enforcement mechanism." *Id.* at 513 (quoting *Cannon v. University of Chicago*, 441 U.S. 677, 742, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979)).

The Second Circuit found the District Court's opinion in *Olmsted* to be "thorough and well-reasoned," and affirmed. *Olmsted*, 283 F.3d at 431–32. Citing the Supreme Court's holding in *Sandoval* that Congressional intent to create a right of action is "determinative," the Second Circuit stated that "[a] court must 'begin [its] search for Congress's intent with the text

---

**11.** Sections 26(f) and 27(i) state that "[i]t shall be unlawful" to sell variable insurance contracts "unless the fees and charges deducted under the contract, in the aggregate, are reasonable in relation to the services rendered, the expenses expected to be incurred, and the risks assumed by the insurance company ..." 15 U.S.C. § 80a–26(f)(2)(A); *see also* 15 U.S.C. § 80a–27(i)(2). The district court observed that "there is no question that the phrase 'it shall be unlawful' merely prohibits certain conduct; it does not in its terms create or alter any civil remedies," and thus "if a private right of action is to be found, it must be read into these sections." *Olmsted*, 134 F. Supp 2d. at 512–13.

and structure' of the statute … and cannot ordinarily conclude that Congress intended to create a right of action when none was explicitly provided." *Olmsted,* 283 F.3d at 432 (quoting *Sandoval,* 532 U.S. at 288, 121 S.Ct. 1511). Since "[n]o provision of the [1940 Act] explicitly provides for a private right of action for violations of either § 26(f) or § 27(i)," the Second Circuit concluded that "we must presume that Congress did not intend one." *Id.* The Second Circuit in *Olmsted* further noted that such presumption is "strengthened" by the fact that Sections 26(f) and 27(i) "do not contain rights-creating language." *Id.* Rather, "[s]tatutes that focus on the person regulated rather than the individuals protected create no implication of an intent to confer rights on a particular class of persons." *Id.* at 433 (quoting *Sandoval,* 532 U.S. at 289, 121 S.Ct. 1511) (internal citations omitted).

The Second Circuit also noted in *Olmsted* that Section 42 of the 1940 Act provides for enforcement of all 1940 Act provisions by the SEC, but not by private litigants. *See id.* Accordingly, the Court concluded that the 1940 Act's text "creates a strong presumption that Congress did not intend to create private rights of action for violations of §§ 26(f) and 27(i)," and affirmed the District Court's opinion. *Id.*[12] That holding is equally applicable here.

*b. There Is No Evidence Of Congressional Intent To Create An Implied Right Of Action Under Section 34(b)*

An analysis similar to that in *Olmsted* shows that no private right of action may be implied under Section 34(b). Section 34(b) states in its entirety:

It shall be unlawful for any person to make any untrue statement of a material fact in any registration statement, application, report, account, record, or other document filed or transmitted pursuant to this Act or the keeping of which is required pursuant to section 80a–30(a) of this title. It shall be unlawful for any person so filing, transmitting, or keeping any such document to omit to state therein any fact necessary in order to prevent the statements made therein, in the light of the circumstances under which they were made, from being materially misleading. For the purposes of this subsection, any part of any such document which is signed or certified by an accountant or auditor in his capacity as such shall be deemed to be made, filed, transmitted, or kept by such accountant or auditor, as well as by the person filing, transmitting, or keeping the complete document.

15 U.S.C. § 80a–33(b). As with the sections of the 1940 Act at issue in *Olmsted,* this text does not contain "rights-creating language," but rather merely describes prohibited actions. The absence of rights-creating language thus strengthens the presumption that Congress did not intend to imply a private right of action under the Section 34(b). *Olmsted,* 283 F.3d at 432.

Likewise, the observations of the Second Circuit in *Olmsted* about the enforcement scheme of the 1940 Act are equally applicable here. Since Section 42 of the 1940 Act explicitly provided for SEC enforcement of "all [1940 Act] provisions," private rights of action must have been foreclosed under other sections unless explicitly granted. *Olmsted,* 283 F.3d at 433. In

---

**12.** Another important factor considered by the Supreme Court in determining Congressional intent was whether Congress enacted express private civil remedies in other sections of the legislation at issue. *See, e.g.,*

*Transamerica Mortgage,* 444 U.S. at 19, 100 S.Ct. 242 ("where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it").

reaching this conclusion, the Court noted that "the express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others." *Olmsted*, 283 F.3d at 433 (quoting *Sandoval*, 532 U.S. at 290, 121 S.Ct. 1511).

Subsequent amendments after the enactment of the 1940 Act further negate plaintiff's supposition that a private right of action should be implied in Section 34(b). Congress had the opportunity to create a private cause of action under Section 34(b) in 1970 when it amended Section 36(b) to include such a right, but chose to forego such an addition. Thus, "Congress's explicit provision of a private right of action to enforce one section of a statute suggests that omission of an explicit private right to enforce other sections was intentional." *Olmsted*, 283 F.3d at 433.

Following *Olmsted*, this Court has specifically refused to find an implied private right of action under Section 34(b). In *Dorchester Investors v. Peak Int'l Ltd.*, the Court noted that neither the Supreme Court nor any circuit court of appeals has addressed the issue of whether there is a private right of action under Section 34(b). But the Court was "persuaded by the decision" of the District Court in *Olmsted:*

> In *Olmsted*, Judge Garaufis held that "Congress did not intend to give inves-

tors a private right of action under [various other sections of the [1940 Act]]. To infer otherwise would encroach upon the powers of legislation reserved for Congress. This court will not graft onto [provisions of the [1940 Act]] a remedy which Congress did not intend to provide."

134 F.Supp 2d. at 581.[13] Accordingly, the Court "agree[d] with the analysis of *Olmsted* and decline[d] to infer a private right of action under Section 34(b) of the [1940 Act]." *Id.*

Similarly, in *White v. Heartland High–Yield Mun. Bond Fund*, 237 F. Supp 2d. 982 (E.D.Wis.2002), the Court held that no implied private right of action exists under Section 22 and 34(b) of the 1940 Act. The Court quoted extensively from the Second Circuit's opinion in *Olmsted* and found that its rationale "applies to §§ 22 and 34(b) with equal force." *Id.* at 987. *See also meVC Draper Fisher Jurvetson Fund I, Inc. v. Millennium Partners, Inc.*, 260 F.Supp.2d 616, 625 (S.D.N.Y.2003) (Sand, J.) (no implied private right of action exists under Section 12(d)(1)(A) of the 1940 Act). Notably, since the Second Circuit's decision in *Olmsted*, there appear to have been no decisions in which a court has found an implied private right of action under any section of the 1940 Act.[14]

---

**13.** When *Dorchester* was decided, the Second Circuit had not yet affirmed the district court's holding in *Olmsted*.

**14.** Before *Central Bank*, a number of courts (including the Second Circuit) routinely found implied rights of action under various sections of the 1940 Act. *See, e.g., Fogel v. Chestnutt,* 668 F.2d 100, 107 (2d Cir.1981) (finding an implied right of action under Section 36(a)); *Meyer v. Oppenheimer Mgmt. Corp.,* 764 F.2d 76, 88 (2d Cir.1985) (finding an implied right of action under Section 15(f)), *aff'd,* 895 F.2d 861 (2d Cir.1990). In *Olmsted,* however, the Second Circuit noted that when those earlier cases finding implied private rights of action under the 1940 Act were

decided, "courts had more latitude to weigh statutory policy and other considerations than they do now." 283 F.3d at 434. The Second Circuit noted that those decisions were inconsistent with the analysis now dictated by the Supreme Court, stating "[p]ast decisions reflecting judicial willingness to 'make effective [statutory] purpose' in the context of implied rights of action belong to an *'ancien regime.'*" *Id.* (quoting *Sandoval,* 532 U.S. at 287, 121 S.Ct. 1511 (internal quotation marks omitted)).

Similarly, the *Dorchester* Court specifically rejected the reasoning of several older cases holding that Section 34(b) permitted a private right of action, instead adopting the reasoning of the District Court in *Olmsted* that no such

In sum, the express language of Section 34(b), the contemporaneous legislative history of that provision, and the existence of express remedies under other sections of the 1940 Act make clear there can be no implied private right of action under Section 34(b).

### 2. These Section 34(b) Claims May Only be Brought Derivatively

█ Count III of the Complaint fails for the additional reason that such a claim must be brought derivatively on behalf of the Fund, rather than directly as a class action. Whether a suit is properly derivative or direct may be determined based upon the face of the Complaint. *Olesh v. Dreyfus Corp.*, No. CV–94–1664, 1995 WL 500491, at *6 (E.D.N.Y. Aug. 8, 1995). And it is well-settled that state law controls whether a claim brought by a mutual fund shareholder under the 1940 Act should be brought derivatively or directly. *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 108–09, 111 S.Ct. 1711, 114 L.Ed.2d 152 (1991) (courts should look to the law of the fund's state of incorporation to determine whether a plaintiff who brought a derivative suit under the 1940 Act can avail himself of the "demand futility" exception). *See, e.g., Strougo v. Bassini*, 282 F.3d 162, 168–169 (2d Cir.2002); *Marquit v. Dobson*, No. 98 Civ. 9089, 2000 WL 4155, at *1 (S.D.N.Y. Jan 3, 2000) (holding that "[u]nder the Investment Company Act, the law of the state in which the corporation is *incorporated* governs whether a claim is derivative or direct") (emphasis added); *accord Boland v. Engle*, 113 F.3d 706, 715 (7th Cir.1997) (stating that federal courts should apply state corporation law in determining whether a claim under the 1940 Act is direct or derivative); *Green v. Nuveen Advisory Corp.*, 186 F.R.D. 486, 489 (N.D.Ill.1999) (concluding that for claims under the ICA, private right of action exists. *Dorchester,* 134

courts should generally look to the corporation law of the state where an investment company is incorporated).

Here, the Fund is incorporated under Maryland law. (Holland Decl. Ex. B, 1999 SAI at 44.). In Maryland, "a stockholder cannot sue individually to recover damages for injuries to the corporation." *Goodman v. Poland,* 395 F.Supp. 660, 687 (D.Md. 1975); *see also Indurated Concrete Corp. v. Abbott,* 195 Md. 496, 74 A.2d 17, 22 (1950). That principle is dispositive of plaintiff's purported claim under Section 34(b).

Directly on point is *Waller v. Waller,* 187 Md. 185, 49 A.2d 449 (1946)—still the leading case in Maryland on shareholder standing. There, a shareholder sued several parties, alleging that they had conspired to ruin the shareholder and the corporation. The plaintiff further alleged that the object of the conspiracy was primarily to harm the shareholder plaintiff. The Maryland Court of Appeals disagreed, holding that the shareholder's claims were derivative in nature:

> It is the general rule that an action at law to recover damages for an injury to a corporation can be brought only in the name of the corporation itself acting through its directors, and not by an individual stockholder, though the injury may incidentally result in diminishing or destroying the value of the stock.

*Id.* at 452. As the *Waller* Court further explained:

> The reason for this rule is that the cause of action for injury to the property of a corporation or for impairment or destruction of its business is in the corporation, and such an injury, although it may diminish the value of the capital stock, is not primarily or necessarily a damage to the stockholder, and hence

F. Supp 2d. at 581.

the stockholder's derivative right can be asserted only through the corporation. *Id.* Thus, the *Waller* court affirmed the dismissal of plaintiff's claim, holding that the stockholder could not maintain a direct action "to recover damages for . . . breach of trust which depreciated the capital stock or rendered it valueless." *Id.; see also Werbowsky v. Collomb,* 362 Md. 581, 766 A.2d 123, 135 (2001).

Federal courts addressing claims filed by shareholders of a Maryland fund have applied the same standard. In *Strougo v. Bassini, supra,* the Second Circuit concluded that:

> In deciding whether a shareholder may bring a direct suit, the question the Maryland courts ask is not whether the shareholder suffered injury; if a corporation is injured those who own the corporation are injured too. The inquiry, instead, is whether the shareholders' injury is "distinct" from that suffered by the corporation.

*Id.* at 170.

Where, as in the instant case, a plaintiff shareholder has not sustained any injury distinct from that allegedly inflicted upon an investment company, courts have routinely dismissed the claims asserted directly, rather than derivatively. Thus, in *In re Dreyfus Aggressive Growth Mut. Fund Litig.,* No. 98 Civ. 4318, 2000 WL 10211 (S.D.N.Y. Jan.6, 2000), plaintiffs asserted claims under Section 34(b) and other sections of the 1940 Act, as well as under Sections 11 and 12 of the 1933 Act. Plaintiffs sought to represent a class of investors in two open-ended funds, each incorporated in Maryland, which allegedly performed poorly because of undisclosed self-dealing transactions by the portfolio manager and heavy investment in risky "micro-cap" securities. The Court applied Maryland law and dismissed the 1940 Act claims for failure to bring them derivatively, since the plaintiffs there merely alleged

injury that "was derived from harm to the Funds themselves." *Id.* at *4; *see also Nuveen,* 186 F.R.D. at 489–90 (applying Massachusetts and Minnesota law and dismissing plaintiffs' claims under Section 34(b) and other sections of the 1940 Act for failure to bring them derivatively, because the injury to the fund shareholders from diminution in price of fund shares caused by the allegedly improper advisory fees was not distinct from an injury to the fund itself).

Here, Maryland law similarly requires dismissal of plaintiff's Section 34(b) claim for failure to bring it derivatively. The Complaint makes clear that plaintiff's supposed injuries, and those of the purported class, are not distinct from those of the Fund; rather, they are alleged to arise because the Fund's net asset value declined. In particular, plaintiff alleges that:

- "The acts of the [Merrill Lynch] defendants . . . caused the Fund to purchase [the securities covered by the research reports] at inflated prices . . ." (Compl.¶ 154);

- "The inflated prices also caused the Fund to pay excessive advisory fees, thus reducing the value of the Class Members' shares" (*Id.* at ¶ 155);

- ". . . [Merrill Lynch's] market manipulation and promised research reports alleged above inflated the price of these securities and caused the Fund to purchase these securities at inflated prices or to value these securities at inflated prices causing the Class to overpay for the Fund securities they purchased during the Class Period" (*Id.* at ¶ 183);

- "As of September 26, 2002, the per share price [of the Fund] had declined from a high of $32.49 on March 27, 2000 to approximately $4.15 per share. . . . Accordingly, members of the Class have lost hundreds of millions of

dollars as a result of defendants' unlawful conduct" (*Id.* at ¶¶ 220–221);

- In Count III, which asserts Plaintiff's claim under Section 34(b), Plaintiff alleges that "[a]s a direct and proximate result of defendants' unlawful conduct as alleged herein, plaintiff and the other members of the Class suffered damages in connection with their purchases of Fund shares during the Class Period" (*Id.* at ¶ 274).

Such allegations plainly show that plaintiff's alleged injury was derivative, by virtue of her ownership of shares in the Fund. As manifest on the face of the Complaint, therefore, plaintiff's Section 34(b) claim cannot be maintained directly by this plaintiff.

### 3. The Alleged Omissions are not Material

Even assuming a private right of action under Section 34(b), contrary to the foregoing, and that the shareholder's injury could be found to be distinct from that of the corporation, Plaintiff's claim still fails because the information allegedly withheld from the shareholders was a matter of public knowledge. (*See* Point III.A.1, *supra.*)

### C. Section 10(b) of the 1934 Act and Rule 10b–5

#### 1. The Complaint Fails to Satisfy Rule 10b–5(b)'s Pleading Requirements

To state a claim for a violation of Rule 10b–5(b), a plaintiff must plead with particularity that the defendant (1) made a false statement or omitted to state a material fact, which it had a duty to disclose (2) with scienter, (3) upon which the plaintiff relied, and (4) which caused the plaintiff's injury. *See, e.g., Kalnit v. Eichler,* 264 F.3d 131, 138 (2d Cir.2001). Plaintiff must plead these elements with the particularity required by Fed.R.Civ.P. 9(b), which ap-

plies to all averments of fraud, as well as the Private Securities Litigation Reform Act (the "Reform Act"), which was enacted in 1995 for the express purpose of curbing abusive securities litigation. As shown below, Plaintiff has failed to adequately allege several of these elements.

#### a. Plaintiff Fails to Allege Any Facts Giving Rise to a Duty to Disclose

As with her claims under the 1933 Act, to state a claim under Rule 10b–5, Plaintiff must establish that the Defendants had a duty to disclose any allegedly omitted material information. *See, e.g., In re Canandaigua Sec. Litig.,* 944 F.Supp. 1202, 1208 (S.D.N.Y.1996) (Pollack, J.) ("[m]ere non-disclosure of information will not necessarily give rise to 10b–5 liability even if the information was material; a plaintiff must also establish that the defendants had a duty to disclose" because "there is no affirmative duty of disclosure" under Rule 10b–5) (citations omitted). As with their 1933 Act claims, Plaintiff has failed to allege any facts and their particulars giving rise to such a duty. (*See* Point III.A.1, *supra.*)

#### b. Plaintiff Fails to Plead Loss Causation

More conclusive against Plaintiff's lawsuit is her failure to show that the loss was caused by the alleged misrepresentations and omissions of Merrill Lynch and the Fund's distributors, advisers and directors. "To establish loss causation a plaintiff must show[ ] that the economic harm that it suffered *occurred as a result of* the alleged misrepresentations." *Citibank, N.A. v. K–H Corp.,* 968 F.2d 1489, 1495 (2d Cir.1992) (emphasis in original). *See also Spencer Trask Software and Info. Serv. v. RPost Int'l Ltd.,* No. 02 Civ. 1276, 2003 WL 169801, at *20 (S.D.N.Y. Jan.24, 2003) (Leisure, J.) (dismissing Rule 10b–5

claim for lack of loss causation where plaintiffs failed to link defendants' alleged misrepresentations to the alleged decline in the value of the investment). If, as set out in this Court's opinion in the *24/7 Real Media and Interliant* case, the underlying "fraud" allegedly perpetrated by Merrill Lynch and its analysts was not the proximate cause of the loss in the companies' share price, then the omission of information concerning this "fraud" by the Fund or its affiliates could not itself be a proximate cause of the loss. *See 24/7 Real Media & Interliant* Opinion. Plaintiff here has done no more to plead loss causation than the Plaintiffs in that case.

Merrill Lynch and the Fund are not the insurers of Plaintiff's investment in a highly speculative sector of the market where the omissions complained of are not adequately alleged to have been the proximate cause of the loss. Plaintiff's failure to plead sufficient facts to show loss causation requires dismissal of her Rule 10b–5 claims.

### c. Plaintiff Fails to Allege Scienter on the Part of the Fund, Fund Advisers, or Fund Directors

The Second Circuit has explained that "[t]he requisite state of mind, or scienter, in an action under section 10(b) and Rule 10b–5 that the plaintiff must allege is 'an intent to deceive, manipulate or defraud.'" *Kalnit,* 264 F.3d at 138 (citations omitted). The Reform Act requires a complaint to "state *with particularity* facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2) (emphasis added). A plaintiff can establish this intent by showing either that "defendants had both motive and opportunity to commit fraud," or by alleging facts "that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Kalnit,* 264 F.3d at 138 (citation omitted). Moreover, as this Court has stated,

[T]o establish scienter in misrepresentation cases, facts must be alleged which particularize how and why *each defendant* actually knew, or was reckless in not knowing, that the statements were false at the time made.... To establish scienter in omission cases, facts must be alleged which show that *each defendant* knew, or was reckless in not knowing, the information the plaintiff alleges the defendant failed to disclose.... Conclusory allegations are not sufficient to establish intent to deceive.

*Silva Run Worldwide Ltd. v. Bear Stearns & Co.,* No. 96 Civ. 5102, 2000 WL 1672324, at *4 (S.D.N.Y. Nov.6, 2000) (Knapp, J.) (emphasis added; citation omitted). The Complaint here fails to satisfy these pleading requirements.

### i. Plaintiff Fails to Allege Particularized Facts Demonstrating Motive and Opportunity

The Second Circuit has explained "motive and opportunity" as follows:

Motive would entail concrete benefits that could be realized by one or more of the false statements and wrongful non-disclosures alleged. Opportunity would entail the means and likely prospect of achieving concrete benefits by the means alleged.

*Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1130 (2d Cir.1994). The Second Circuit has rejected allegations such as a desire for the corporation to appear profitable as "insufficient" to plead motive. *Kalnit,* 264 F.3d at 139–140; *see also Chill v. Gen. Elec. Co.,* 101 F.3d 263, 268 (2d Cir.1996) (rejecting as a motive the corporation's interest in justifying to its shareholders a large investment in its subsidiary: "such a generalized motive, one which could be imputed to any publicly-owned, for-profit endeavor, is not sufficiently concrete for purposes of inferring scienter"); *San Leandro Emergency Med.*

*Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 814 (2d Cir.1996) (companies' desire to maintain a high bond or credit rating is a desire shared by all companies and does not qualify as a sufficient motive for inferring scienter). The Complaint here does not allege any "concrete benefits" that would accrue to the Fund, Fund Advisers or Fund Directors as a result of the alleged omissions. There is no allegation that these defendants received any investment banking fees, or that their compensation was based upon any such fees. Indeed, the purported motive of these defendants to obtain investment banking business for MLPF & S defies economic reason. Plaintiff alleges that MLIM only invested the Fund's assets in certain companies because it knew that MLPF & S either had or was seeking an investment banking relationship with that company, without regard to whether those companies were good investments for the Fund. (Compl.¶ 15.) However, since MLIM's advisory fees are based on a percentage of the Fund's net assets, if the Fund's assets diminished, MLIM's advisory fees also declined. Plaintiff's premise thus contradicts the assumption that the Fund, Fund Advisers and Fund Directors were acting in their own economic self-interest. Because courts assume that defendants act in their "informed self-interest," the allegations in the Complaint affirmatively refute scienter. *See, e.g., Shields*, 25 F.3d at 1130 ("[i]n looking for a sufficient allegation of motive, we assume that the defendant is acting in his or her informed economic self-interest"); *DiLeo v. Ernst & Young*, 901 F.2d 624, 629 (7th Cir.1990) ("indulging ready inferences of irrationality would too easily allow the inference that ordinary business reverses are fraud. One who believes that another has behaved irrationally has to make a strong case").

### ii. Plaintiff Fails to Allege Particularized Facts Demonstrating Strong Circumstantial Evidence of Conscious Misbehavior

Plaintiff's allegations also fail to identify circumstances indicating "conscious misbehavior" by the Fund, Fund Advisers and Fund Directors. To survive dismissal under the "conscious misbehavior" theory, a plaintiff must allege reckless conduct with specificity, which is "at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Honeyman v. Hoyt (In Re Carter–Wallace, Inc. Secs. Litig.)*, 220 F.3d 36, 39 (2d Cir.2000) (citation omitted). To satisfy this "highly fact-based inquiry," a complaint must "specifically allege[ ] defendants' knowledge of facts or access to information contradicting their public statements." *Kalnit*, 264 F.3d at 142 (citation omitted).

The Complaint here fails to satisfy this standard. Plaintiff does not allege *any* communications between MLPF & S and the Fund, Fund Advisers or Fund Directors concerning research reports or investment banking fees. Nor does Plaintiff allege any other facts to suggest that the Fund, Fund Advisers or Fund Directors knew any of the MLPF & S research reports were misleading, or any facts (other than publicly available information) that they knew that MLPF & S was performing investment banking services for companies in the Fund's portfolios. Instead, Plaintiff makes the conclusory allegation that "[t]he sheer number of these companies in the Fund's portfolio covered by the Merrill Lynch research department *suggests* that the opportunity for the Fund's affiliates to obtain investment banking

business was a material consideration in choosing the securities which the Fund would buy." (Compl. ¶ 150 (emphasis added).) Such a "suggestion" is insufficient to satisfy the Reform Act and Second Circuit's pleading requirements for scienter.

In addition, as previously noted, there was no duty to disclose that MLPF & S provided investment banking services to companies in the Fund's portfolio. (*See* Point III.A.1, *supra*.) Therefore, the Defendants' "recklessness cannot be inferred from the failure to disclose" facts they had no duty to disclose. *Kalnit*, 264 F.3d at 143.

### 2. The Complaint Fails to Satisfy Rule 10b–5(a) and (c)'s Pleading Requirements

To the extent that the Plaintiff's "scheme" merely repackages her 10b–5(b) claim, such allegations fail for the reasons set out above. *See Schnell v. Conseco, Inc.*, 43 F.Supp.2d 438, 448 (S.D.N.Y.1999). To the extent that Plaintiff has merely rehashed the "scheme" set out in the *24/7 Real Media* and *Interliant* complaints, such allegations fail for the reasons set out in this Court's opinion in that matter.

▉ Plaintiff's more novel claim—that Fund personnel engaged in a scheme to "park" securities in the Fund even while the market collapsed—fails because Plaintiff has not alleged the barest minimum of facts to support such an assertion. Plaintiff has not stated which securities were parked, when they were parked, or why the Fund's purchase of them was parking, as opposed to a legitimate investment. Plaintiff's only support for her assertion is that (1) a company looks for an underwriter that will support the price of the company's stock through market making activities; (2) a broker-dealer's ability to place a

company's securities in a proprietary mutual fund can have a positive impact on supporting the stock price; and (3) Merrill Lynch proprietary funds had many of the same officers and directors and invested their portfolios in a "disproportionately" high percentage of the same securities. (Compl.¶ 158–67.) For the reasons more thoroughly examined in Point III.A.1.c, *supra*, the conclusory allegation that Merrill Lynch Global Technology Fund and those associated with it invested in a "disproportionately" high percentage of securities covered by Merrill Lynch research reports, or that Merrill Lynch proprietary funds overlapped in their investments, is insufficient to state a claim upon which relief may be granted in the absence of some fact that shows either the disproportion complained of or some other evidence of wrongdoing.[15]

### D. Control Person Liability under 1933 Act, 1934 Act, and 1940 Act

▉ Plaintiff also asserts claims for control person liability under Section 15 of the 1933 Act, Section 20 of the 1934 Act and (presumably, since she does not cite a section) Section 48 of the 1940 Act. (*See* Compl. ¶¶ 241–245, 264–268, 275–277, 340–346.) Because Plaintiff has failed to state a claim against the Defendants for a primary violation of the federal securities law, her claims for control person liability necessarily fail. *See e.g., Shields*, 25 F.3d at 1132 (affirming dismissal of Section 20 claim where the primary violation asserted by plaintiff under Rule 10b–5 was not adequately pled and thus was properly dismissed); *In re Ultrafem*, 91 F.Supp.2d at 701 (dismissing Section 15 claim because plaintiffs did not establish a primary violation of Sections 11 or 12).

---

**15.** Moreover, as detailed in Point III.C.1, Plaintiff has failed to sufficiently allege loss causation or scienter with respect to any of her 10(b) claims.

## E. Plaintiff's 1933 Act and 1934 Act Claims are Time–Barred

As prescribed in Section 13 of the 1933 Act, any claim under Section 11 or Section 12(a)(2) must be brought "within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence." 15 U.S.C. § 77m. For claims arising under Section 10(b) of the 1934 Act, which are brought after the enactment of the Sarbanes–Oxley Act, the applicable statute of limitations is two years. *See* Sarbanes–Oxley Act of 2002, Pub.L. No. 107–204, § 804, 116 Stat. 745 (codified at 28 U.S.C. § 1658).

For the reasons set forth in Point III. A.1.b, *supra*, Plaintiff was on inquiry notice of her claim that MLPF & S purportedly issued misleading research reports over two years before she sued. Plaintiff was also on inquiry notice that the Fund invested in the securities of companies with which MLPF & S had or sought investment banking business over two years before bringing her suit. (*See* Point III.A.1.a and c, *supra.*) These claims are thus time-barred.

## IV. CONCLUSION

Plaintiff's Consolidated Amended Complaint is dismissed in its entirety, with prejudice.

**SO ORDERED.**

## *ON MOTION TO ALTER JUDGMENT AND AMEND COMPLAINT*

### *DECISION AND ORDER*

Plaintiff seeks leave to alter this Court's Decision and Order of July 2, 2003, and to further amend her amended complaint. Among other things, her proposed amended complaint would withdraw claims against the independent director defendants. An independent board is free to act in the interests of the Fund's shareholders. Plaintiff's decision nonetheless to proceed with a class claim, when she has not sustained any injury distinct from that allegedly inflicted upon the Fund,[1] departs from the Maryland requirement that such claims may be asserted derivatively only. *See Strougo v. Bassini*, 282 F.3d 162 (2d Cir.2002) ("[U]nder Maryland law ... [w]hen the corporation is injured and the injury to its shareholders derives from that injury ... only the corporation may bring suit.... The shareholder may, at most, sue derivatively."); *Goodman v. Poland*, 395 F.Supp. 660, 687 (D.Md.1975) ("it is well established in Maryland that a stockholder cannot sue individually to recover damages for injuries to the corporation, even though the directors may have entered into an unlawful conspiracy for the specific purpose of ruining the corporation"); *Indurated Concrete Corp. v. Abbott*, 195 Md. 496, 74 A.2d 17, 22 (1950); *Waller v. Waller*, 187 Md. 185, 49 A.2d 449, 452 (1946); *see also Rathborne v. Rathborne*, 683 F.2d 914, 919 n. 16 (5th Cir.1982) ("where a corporation has been defrauded in a securities transaction, a shareholder does not have standing to bring a direct action under Rule 10b–5"); *Dueren v. Credit Suisse First Boston Corp.*, No. 02 CV 3921(JSM), 2003 WL 21767509, at \*3 (S.D.N.Y. July 31, 2003) ("Loss of investment value resulting from breach of a duty owed to a corporation does not give rise to a direct cause of action by the corporation's shareholders."); VIII Louis Loss & Joel Seligman, Securities Regulation 3704 (3d ed.1991).

---

1. Loss of investment value is, in the first instance, a loss to the corporation that affects shareholders only indirectly. *See Dueren v. Credit Suisse First Boston Corp.*, No. 02 CV 3921(JSM), 2003 WL 21767509, at \*3 (S.D.N.Y. July 31, 2003) (*citing Manson v. Stacescu*, 11 F.3d 1127, 1131–1132 (2d Cir. 1993)).

If Plaintiff had proceeded initially according to Maryland law, there would have been no occasion for a Class suit, for the retention of attorneys for the Class, and for the concomitant and unwarranted expense in pressing Plaintiff's grievances.

Apart from the questionable decision to disregard Maryland law, Plaintiff has not shown any injustice from the decision to dismiss the complaint with prejudice. This Court initially dismissed the Plaintiff's inordinately prolix complaint on specificity grounds *and* on statute of limitations grounds. There was clearly enough publicly available information to put the plaintiff on inquiry notice of her claims.[2] As noted in this Court's earlier decisions, and set out in more detail in this Court's Order of August 12, 2003, the alleged conflict of interest and inflation of ratings were well documented,[3] and apparently known to Plaintiff. *See* Original Complaint ¶ 53 ("sometime during the year 2000, various publications suggested that conflicts of interest were becoming rampant in the broker-dealer industry").

For a further summary of the available public information, see Rod McQueen, The Endangered Species, The Financial Post (Toronto, Canada), Sept. 9, 1995 (conflicts of interest between underwriting and analysts in brokerage firms were becoming endemic); Roger Lowenstein, Today's Analyst Often Wears Two Hats, The Wall Street Journal, May 2, 1996 (investment banks "have persuaded clients to hire underwriters on the basis of their analysts' selling power" and that "[i]n turn, the analyst's worth is increasingly dependent on his or her ability to bring in deals"—"investors, journalists and others who deal with the Street would do well to keep in mind that, often times, the analyst is wearing two hats."); Steve Baily & Steven Syre, Taking Analysts' Tempting Forecasts with Grain of Salt, The Boston Globe, October 23, 1996 (analysts are often over-optimistic about long-term earnings forecasts for equity offerings because "the relationship between the analysts and the investment banking business ... pays their bills."—mounting evidence suggests that you "trust [analysts] at your peril."); John R. Dorfman, All–Star Analysts 1997 Survey, The Wall Street Journal, June 19, 1997 ("Analysts earn that pay in lots of ways, some of which have little or nothing to do with picking stocks or accurately estimating corporate earnings. For example, at many firms, analysts are expected to bring in investment-banking deals"); John Hechinger, Heard in New England: Analysts May Hate to Say 'Sell,' But a Few Companies Do Hear It, The Wall Street Journal, Apr. 8, 1998 (cautious investors would be "hard-pressed to scare up a bearish research report telling them which shares to dump." Of 2,066 ratings, 68% were "buys" or "strong buys," 31% were holds and less than 1% were "weak sells" or "strong sells."—Analysts often won't issue a "sell" because they "don't

---

**2.** *See Dodds v. Cigna Sec., Inc.,* 12 F.3d 346, 350 (2d Cir.1993) ("A plaintiff in a federal securities case will be deemed to have discovered fraud for purposes of triggering the statute of limitations when a reasonable investor of ordinary intelligence would have discovered the existence of the [alleged] fraud."); *see also In re Merrill Lynch Ltd. Partnerships Litig.,* 154 F.3d 56, 60 (2d Cir.1998) ("the question of inquiry notice need not be left to a finder of fact").

**3.** "[O]n a motion to dismiss, a court may consider ... 'matters as to which judicial notice may be taken....'" *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir.2002) (quoting *Brass v. American Film Technologies, Inc.,* 987 F.2d 142, 150 (2d Cir.1993)). The Court may take judicial notice of newspaper articles for the fact of their publication without transforming the motion into one for summary judgment. *See In re Sterling Foster & Co., Inc. Securities Litigation,* 222 F.Supp.2d 312, 321 (E.D.N.Y.2002); *Schwenk v. Kavanaugh,* 4 F.Supp.2d 116, 118 (N.D.N.Y.1998).

like to anger companies that could be their firm's investment-banking clients."); Jeffrey Laderman, Who Can You Trust?, Business Week, Oct. 5, 1998 ("brokerage firms are not about to break up the money machine that pairs analysts with dealmakers. And analysts are not about to risk offending the companies they cover. Woe to the investor who doesn't keep these two ideas in mind before investing on a stock recommendation."); Jon Birger, New Executive Henry Blodget, Crain's New York Business, Mar. 22, 1999 ("Initial public offerings have become huge moneymakers for investment banks, and firms frequently select their underwriters based upon the reputation of the analyst who covers their industry."); Frog Spawn, The Economist, Apr. 17, 1999 (Sell is a four-letter word); SEC Chairman Aurthur Levitt, Address at the Investors' Town Meeting, Albuquerque, New Mexico, Nov. 20, 1999 ("analysts' paychecks are typically tied to the performance of their employers. You can imagine how unpopular an analyst would be who downgrades his firm's best client. Is it any wonder that today, a 'sell' recommendation from an analyst is as common as a Barbara Streisand concert?"); Erick Schonfeld, The High Price of Research, Fortune, Mar. 20, 2000 ("Analysts of all stripes ... increasingly derive a portion of their compensation, directly or indirectly, from the companies they cover."); David Streitfeld, Analyst With a Knack, The Washington Post, Apr. 2, 2000 (" 'Any analyst whose firm does major investment banking work—and nearly all of them do—is suspect. I don't know why the SEC doesn't ask these firms to spin off their research operations.' ") (quoting Jeffrey Hooke, author of Security Analysis on Wall Street); Robert Samuelson, A High–Tech Accounting?, Newsweek, Apr. 3, 2000

(" 'The conflicts of interest are immense....' Stock analysts are increasingly 'cheerleaders' [whose] pay depends on the firm's underwriting, which depends on enthusiastic research reports") (quoting Professor Jay Ritter); Eileen Buckley, Holding Analysts Accountable, The Industry Standard, June 12, 2000 ("Research analysts writing recommendations of closely watched Internet stocks routinely face conflicts of interest.").

This Court cites these articles to show that the alleged conflicts of interest and inflation of ratings were sufficiently known to the public early enough for the statute of limitations to bar claims that such conflicts or inflation formed the basis of a fraud. The Court in no way suggests that a fraud occurred, and Merrill Lynch has at no time admitted that its course of business operated as a fraud within the purview of the PSLRA or the Securities Laws, or was intended to injure investors, or that prices of shares had been artificially inflated by their analysts.

Plaintiff's allusion to *Newman v. Warnaco Group, Inc.*, 335 F.3d 187 (2d Cir. 2003), to rebut this Court's statute of limitations analysis is unavailing. Unlike in *Newman*, Merrill Lynch did not give a contemporaneous, benign explanation for the myriad news articles that served to put plaintiff on inquiry notice. The only "explanation" recited by Plaintiff is that in the proposed complaint at ¶ 296—a statement that Merrill Lynch precludes analysts from seeking approval from corporate clients or investment bankers before changing a recommendation. This statement was issued in October of 2001, a full year after the last of the news articles cited above and five years after the first. It is clearly not contemporaneous with the articles, or substantively sufficient to make it reasonable for plaintiffs not to inquire into the questions raised by such articles.[4]

---

**4.** It is also unclear whether the *Warnaco* court would have found that a denial of wrongdoing would have the same effect on

plaintiffs as a detailed and benign explanation.

268

As for the pleading deficiencies that served as a basis for dismissal, this Court early recognized the problems with the Plaintiff's original complaint and gave Plaintiff a wide-open chance to make amendments before dismissal. While it is true that this is plaintiff's first sponsored request for leave to amend, it is her second opportunity to properly frame and assert her complaint. Case Management Order No. 3 in this action specifically directed and warned plaintiffs in these consolidated cases to file consolidated amended complaints that:

> will comply with the pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure and the PSLRA, in particular 15 U.S.C. § 78u–4(b)(1) & (2). The factual allegations must be specific to the security in question and should clearly allege who said what to whom concerning that particular security. Consolidated amended complaints should also be carefully framed in order that they may fully comply with all applicable law regarding the pleading of loss causation.

The Decision and Order of this Court of July 2, 2003 held that plaintiff had ignored and failed to satisfy the requirements of Rule 9(b) and the PSLRA because she ignored and failed to plead the critical applicable elements of loss causation in the face of the bursting of the internet bubble, ignored and failed to plead her complaint with particularity, ignored and failed to adequately plead scienter, and ignored and failed to plead a duty to disclose the requisite publicly available information. Plaintiff's proposed amended complaint does not show that the information cited herein was not publicly available, offset the burst of the internet bubble which intervened between the purchase and subsequent holding of the stock which occasioned her losses, cure the other pleading deficiencies found in her complaint, or satisfy the statute of limitations. Thus, Plaintiff's pro-

posed amended complaint cannot itself survive a motion for dismissal. *See In re American Exp. Co. Shareholder Litig.,* 39 F.3d 395, 402 (2d Cir.1994) ("leave to amend may be denied if the amendment would be futile"); *see also Emergent Capital Inv. Management, LLC v. Stonepath Group, Inc.,* 195 F.Supp.2d 551, 563 n. 4 (S.D.N.Y.2002) (where plaintiff was given the opportunity to amend its complaint and submitted substantially the same complaint, the Court found no need to grant subsequent motion to submit yet another nonviable complaint).

Plaintiff's attempt to shift the focus of her complaint to IPO manipulation will not save it from dismissal. It is a mere restatement of her prior allegations that Merrill Lynch manipulated the price of securities purchased by the Fund, causing the Fund to overpay for such securities. Plaintiff does not plead this scenario, as it relates to the Fund, with the particularity necessary to survive dismissal, nor does it cure the pleading deficiencies found in any of her complaints.

Moreover, Plaintiff's proposed second consolidated amended complaint is 112 pages long, contains 424 paragraphs, and is in clear violation of Federal Rule of Civil Procedure 8(a), which mandates that pleadings shall consist of a "short and plain statement of the claim showing that the pleader is entitled to relief." An unquestionably simple complaint uttered in so many pages borders very substantially on what Congress intended to eliminate under the Private Securities Litigation Reform Act's heading of "abusive litigation."

The motion to alter the judgment is denied. The motion to amend the complaint is denied.

**SO ORDERED.**